Summons Iss/SEA 29844

FILED    ENTERED
LODGED    RECEIVED

OCT 20 2009    JC

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

COMPLIANCE COACH, INC.,

                    Plaintiff,

          v.

FEDERAL DEPOSIT INSURANCE
CORPORATION,

                    Defendant.

Case No.: **C09  1490** RAS

COMPLAINT

JURY TRIAL DEMANDED



09-CV-01490-CMP

---

Plaintiff Compliance Coach, Inc. ("CCI") by its undersigned counsel alleges as follows:

## **PARTIES**

1.     At all times mentioned herein, CCI was and now is a corporation existing under and by virtue of the laws of the State of California.

2.     Defendant Federal Deposit Insurance Corporation ("FDIC") is the agency of the United States government charged by law with, among other duties, administering the Federal Deposit Insurance Act and the federal bank deposit insurance system.  The FDIC is sued in its capacity as receiver of Washington Mutual Bank, Henderson, Nevada ("WMB"), which was a federal savings bank chartered pursuant to the Homeowners' Loan Act, 12 U.S.C. §§ 1461-70.

ORIGINAL

COMPLAINT -
BJA-000 \ 470783.doc

-1-

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1

## JURISDICTION AND VENUE

2      3.      This action arises under the constitution and laws of the United States including,

3   without limitation, the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811, et seq.

4      4.      This Court has jurisdiction over the subject matter of this action pursuant to 12

5   U.S.C. §§ 1819(b)(2)(A) and 1821(d)(6) and 28 U.S.C. § 1331.

6      5.      Venue is proper in this Court under 12 U.S.C. § 1821(d)(6) and 28 U.S.C. §

7   1391(e).

8

## BACKGROUND

9      6.      On September 25, 2008 (the "Receivership Date"), the Director of the Office of

10  Thrift Supervision, by Order No. 2008-36, appointed the FDIC as receiver of WMB and advised

11  that FDIC was immediately taking possession of WMB (the "Receivership").

12     7.      Immediately after its appointment as receiver, the FDIC sold substantially all of

13  the assets of WMB, including the stock of WMB to J.P. Morgan Chase Bank, a national

14  association.

15

## THE FACTS GIVING RISE TO CCI'S CLAIM

16     8.      The primary business of CCI is to provide computer software to assist in the

17  standardized training of employees and agents of large businesses in order to facilitate such

18  businesses' compliance with applicable law.

19     9.      Effective July 1, 2008, a written agreement entitled "Web Service Agreement"

20  (the "Agreement") was entered into between CCI, on the one hand, and WMB, including its

21  affiliates and direct and indirect subsidiaries, on the other hand.   A true and correct copy of the

22  Agreement is attached as Exhibit "A."

23     10.     The Agreement was executed by Beverly Cary, as Senior Vice President of

24  WMB, on July 17, 2008 in Seattle, Washington and by Sai Huda, as Chief Executive Officer of

25  CCI, on July 21, 2008 in San Diego, California.

26     11.     Between July 21, 2008 and October 15, 2009, CCI performed each and every

27  obligation on its part to be performed under the Agreement by electronically delivering to WMB

COMPLAINT -
BJA-000 \ 470783.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1  in San Diego the software which is the subject of the Agreement. WMB personnel subsequently

2  confirmed that the software was deployed by WMB, however, to date, WMB paid only $65,000

3  of the total agreed price of $260,000, leaving an unpaid balance of $195,000.

4       12.     The Agreement was repudiated by FDIC on or about July 8, 2009.

5       13.     Section 3.2 of the Agreement pertaining to post-termination matters provides that

6  from and after termination, all sums owed to CCI by WMB shall become immediately due and

7  payable. By reason of the termination of the Agreement, the entirety of the unpaid balance of

8  $195,000 became fully due and payable.

9  **PROOF OF CLAIM**

10       14.     Shortly after July 8, 2009, CCI received a letter from the FDIC dated July 8, 2009

11  (the "Repudiation Letter) advising that the Agreement had been repudiated and that if CCI

12  wished to file a claim with FDIC-Receiver, it was required do so within 90-days from the date of

13  the letter or December 30, 2009, whichever was later. A true and correct copy of the

14  Repudiation Letter dated July 8, 2009 is attached hereto as Exhibit "B."

15       15.     On or shortly after July 21, 2009, CCI through counsel, Procopio, Cory,

16  Hargreaves & Savitch, filed a claim (the "Claim") with the FDIC based on the facts set forth in

17  paragraphs 8 and 13 above. The Claim specifically provides that no part thereof is comprised of

18  or includes punitive or exemplary damages, damages for lost profits or opportunity, or damages

19  for pain and suffering. A true and correct copy of the Claim is attached hereto as Exhibit "C."

20  **THE FDIC DISALLOWANCE OF THE CLAIM**

21       16.     On or shortly after August 21, 2009, a letter was received from the FDIC dated

22  August 21, 2009 (the "Disallowance Letter") which disallowed the claim in its entirety. The

23  reason provided for the disallowance was "Your claim has not been proven to the satisfaction of

24  the Receiver." No further reason was provided. The Disallowance Letter additionally provided

25  that if a lawsuit was not filed within 60-days of August 21, 2009 regarding the disallowance of

26  the Claim, the Claim would be forever barred. The Disallowance Letter further provided that the

27  lawsuit was to be commenced either in the principal place of business in the United States

COMPLAINT -
BJA-000 \ 470783.doc

-3-

1    District Court for the district within which the failed institution's principal place of business was

2    located or the United States District Court for the District of Columbia.

3        17.    CCI disagrees with the disallowance of the Claim and, accordingly, CCI has filed

4    this action.

5                            **CLAIM FOR RELIEF**

6        18.    CCI incorporates the allegations and averments contained in paragraphs 1 through

7    17 above as if set forth fully herein.

8        19.    Under 12 U.S.C. § 1821(d)(6)(A), this Court has de novo jurisdiction to consider

9    the Claim. See, e.g., Freeman v. FDIC, 56 F.3d 1394, 1400 (D.C. Cir. 1995)). "[U]nder section

10   1821(d)(6) [claimant] had recourse to de novo a judicial review of the FDIC's denial of [their]

11   claim"); Benjamin Franklin Shareholders' Litig. Fund v. FDIC, 501 F.Supp. 2d 103, 106 (D.D.C.

12   2007) ("[T]his court reviews de novo claims filed with, and processed by the FDIC under its

13   administrative claims process.") (citing Freeman v. FDIC, 56 F.3d 1394, 1400 (D.C. Cir. 1995)).

14       20.    The Claim is a valid and proven claim against the Receivership and the FDIC is

15   obligated to pay the Claim (subject to and in accordance with 12 U.S.C. § 1821(d)(11)).

16                          **PRAYER FOR RELIEF**

17       WHEREFORE, CCI respectfully requests this Court to grant the following relief:

18   1.    An order declaring the Claim to be valid and proven against the Receivership;

19   2.    An order directing FDIC to pay the Claim from assets of the Receivership in

20   accordance with 12 U.S.C. § 1821(d)(11);

21   3.    An order declaring that the FDIC's August 21, 2009 disallowance of the claim to

22   be void and that the parties should proceed as if such disallowance never occurred;

23   4.    Award CCI costs and attorney's fees as may be permitted by law; and,

24   5.    Award CCI such other relief as may be just.

25

26

27

COMPLAINT -
BJA-000 \ 470783.doc                          -4-

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1

2
## <u>DEMAND FOR JURY TRIAL</u>

3
Plaintiff by and through its attorneys hereby demand a trial by jury on the claim asserted

4
herein otherwise triable by a jury asserted in the complaint.

5

6
DATED this 20th day of October, 2009.

7
STOKES LAWRENCE, P.S.

8

9
By: _____

10
Bradford J. Axel, WSBA #29269
Attorneys for Plaintiff

11
Stokes Lawrence, P.S.

12
800 Fifth Avenue, Suite 4000
Seattle, WA 98104

13
(206) 626-6000
Fax: (206) 464-1496
BJA@stokeslaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

COMPLAINT -
BJA-000 \ 470783.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

# EXHIBIT A

# Web Services Agreement

This Agreement is made on this first day of July, 2008 ("Effective Date") by and between **Compliance Coach, Inc.** ("Compliance Coach") and **Washington Mutual Bank**, a federal savings association, including its affiliates and direct and indirect subsidiaries (collectively, "WaMu"). Each of WaMu and Compliance Coach may be individually referred to as a "Party" and together as the "Parties."

## RECITALS

A.       Compliance Coach is engaged in the development, licensing and distribution of certain web-based compliance training services (collectively, the "Web Services"), as more fully described in Schedule A (The Web Services), and Compliance Coach has extensive experience providing such services to large organizations; and

B.       WaMu desires to license from Compliance Coach access to the Web Services.

NOW, THEREFORE, in consideration of the promises contained in this Agreement, the Parties hereby agree as follows:

1.0      **DEFINITIONS**

"Agreement" means this Web Services Agreement and all attached schedules and exhibits.

"Proprietary or Confidential Information" shall mean, with respect to a Party hereto, all information or material which (i) gives that Party some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of that Party; or (ii) which is either (A) marked "Confidential," "Restricted," or "Proprietary Information" or other similar marking, (B) known by the Parties to be considered confidential and proprietary or (C) from all the relevant circumstances should reasonably be assured to be confidential and proprietary. Compliance Coach's Proprietary or Confidential Information shall remain the sole and exclusive property of Compliance Coach. WaMu's Proprietary or Confidential Information shall remain the sole and exclusive property of WaMu. Neither Party shall have any obligation with respect to confidential information which: (i) is or becomes generally known to the public by any means other than a breach of the obligations of a receiving Party; (ii) was previously known to the receiving Party or rightly received by the receiving Party from a third Party; (iii) is independently developed by the receiving Party; or (iv) subject to disclosure under court order or other lawful process.

"Documentation" means such written materials describing the Web Services as are provided by Compliance Coach to WaMu under this Agreement.

"Intellectual Property" means all inventions, works of authorship, information fixed in any tangible medium of expression, moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas, and all other subject matter protectable under patent, copyright, moral right, mask work, trademarks, trade secret, or other laws, including without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, artwork, software, programming, applets, scripts, and designs.

"Web Services" means the Internet related services to be provided by Compliance Coach to WaMu, as more particularly described in Schedule A.

"Users" means WaMu employees who will access the Web Services. At no time shall WaMu permit unauthorized Users to access the Web Services. The maximum number of authorized Users shall be as indicated in Schedule A (Users).

"Deliverables" means all data, materials, work product and deliverables to be developed or delivered by Compliance Coach in connection with the Services hereunder as set forth in an applicable Statement of Work (defined below).

"Statement of Work" or "SOW": The mutually agreed to plan and delineation of activities, events and Services to be performed, and Deliverables to be provided, by Company under this Agreement, which may be evidenced by one or more SOWs. Each SOW shall include a detailed schedule for performance of the Services and delivery of the Deliverables and the costs associated with the Services and Deliverables and will be substantially in the form of the Statement of Work attached hereto as Schedule A (Statement of Work). Each executed SOW shall be attached hereto and incorporated herein, and the terms and conditions of this Agreement shall apply to each SOW as sequentially numbered SOW 1, SOW 2, et seq.

## 2.0    SCOPE AND LICENSE

2.1    License Grant and Restrictions. Subject to the terms and conditions of this Agreement, Compliance Coach grants WaMu, during the term of this Agreement a non-transferable, non-exclusive license for authorized Users to access the Web Services. In addition to the other provisions of this Agreement, the license granted in this Section is subject to the following conditions:

(a)    WaMu shall not exceed the maximum number of authorized Users identified in Schedule A;

(b)    WaMu shall not copy, translate, port, modify, or make derivative works of the Web Services;

(c)    WaMu shall not derive or attempt to derive the source code, source files, or structure of all or any portion of the Web Services by reverse engineering, disassembly, decompilation, or any other means. WaMu shall have no right whatsoever to receive, review, or otherwise use or have access to the source or object code for the Web Services;

(d)    All domain names, and associated rights of Compliance Coach shall remain the property of Compliance Coach;

(e)    Compliance Coach, at no additional charge to WaMu, shall provide WaMu with such documentation made available by Compliance Coach for use of the Web Services. WaMu may copy or modify the documentation or produce its own materials for internal use only.

2.2    Intellectual Property Protection. The Web Services contain material that is protected by United States copyright law and trade secret law. All rights not expressly granted to WaMu under this Agreement are expressly reserved by Compliance Coach.

2.3    Ownership. All Intellectual Property rights in the Web Services are and shall remain the sole and exclusive property of Compliance Coach. To the extent Compliance Coach has licensed certain components of the Web Services from third Parties, all rights to those components are reserved by such third Parties.

2.4    Use of Trademarks/Trade Names. Except as provided herein, neither Party shall use the company trademarks or trade names of the other Party without the other Party's prior written consent. Neither Party shall use the other Party's name or mark in any advertising, written sales promotion, press releases and/or other publicity matters relating to this Agreement without the other Party's written consent. Compliance Coach acknowledges that WaMu has a no publicity policy regarding its vendor relationships. Notwithstanding the above, during the Term of this Agreement only, Compliance Coach may list WaMu's name, but not the WaMu logo, on a customer list that it provides to prospective buyers of its products or services.

2.5    WaMu Support. Support services, if any, to be provided by Compliance Coach to WaMu shall be identified in Schedule A (The Web Services).

2.6    Services. Compliance Coach shall perform the Services according to the terms and conditions set forth in this Agreement and the applicable Statement of Work. Schedule A includes a description of the scope of services to be performed (which may be referred to as a "scope of services"), and additional Schedules may be added, each of which describes a particular project or set of services to be performed. No Statement of Work shall be effective until signed by authorized representatives from both Parties. Compliance Coach shall comply, and shall cause its personnel, agents and any authorized subcontractor(s) providing Services to comply, with applicable WaMu rules, regulations and policies, including the "Vendor Code of Conduct" attached hereto as Schedule B (Vendor Code of Conduct). If Compliance Coach provides any Services at a WaMu facility, then Compliance Coach shall additionally require such personnel, agents and authorized subcontractor(s) to execute and comply with WaMu's "Working With WaMu" terms, attached hereto as Schedule C (Working with WaMu). Except as otherwise specifically authorized by WaMu in writing in advance, all Services shall be provided to and from locations within the United States. If there are ancillary services, functions, responsibilities or tasks not specifically described in a Schedule that are required for the proper performance and provision of the Services under such Schedule or that are an inherent part of, or a necessary subpart included within such Services, then such services, functions, responsibilities or tasks shall be deemed to be implied by and included within the scope of the Schedule to the same extent and in the same manner as if specifically described in such Schedule.

2.7    Subcontracting. Compliance Coach may not subcontract any Services without the prior written consent of WaMu. Compliance Coach shall remain responsible and liable for any subcontractor's and agent's compliance with this Agreement and performance hereunder. WaMu may require Compliance Coach to remove or replace any subcontractor(s) or agent(s) whose performance is deemed unacceptable to WaMu. In no event shall WaMu pay more for subcontracted Services than WaMu pays for Compliance Coach's Services hereunder (e.g., in the case of Services compensated on an hourly basis, time and materials rates for subcontractors shall be the same or less than time and materials rates for Compliance Coach). Compliance Coach shall ensure that all its subcontractors and agents who provide Services under this Agreement are made aware of the terms and conditions of this Agreement.

2.8    Code Audit. At WaMu's request, Compliance Coach shall at its expense conduct an audit of the Deliverables to identify any free and open source software code that may be present in the Deliverables and shall provide the results of the audit to WaMu. Compliance Coach is also encouraged to voluntarily conduct such a code audit periodically at its own expense and provide the results of such audit to WaMu. At no additional cost or expense to WaMu, Compliance Coach shall, and shall use reasonable efforts to cause its employees and agents to, cooperate with WaMu in any investigation that may be required to determine the origin of any code used in any Deliverable(s).

## 3.0    TERM AND TERMINATION

3.1    Term. This Agreement shall commence on the Effective Date and shall continue in force for two (2) years , unless earlier terminated as provided herein. Subject to the payment of applicable license fees, the Agreement shall be automatically renewed for successive one (1) year terms unless either Party, in its discretion, notifies the other Party in writing to the contrary within at least thirty (30) days prior to the expiration of the current term. The initial term and any renewal terms shall be referred to herein as the "term" or "Term." Notwithstanding the above, this Agreement shall automatically terminate if for any reason(s) Compliance Coach ceases to have the rights to distribute the Web Services.

3.2    Termination. Notwithstanding the foregoing, this Agreement shall terminate:

. (a)    On the thirtieth (30th) day after either Party gives the other written notice of a breach by the other of any material term or condition of this Agreement, unless the breach is cured before that day. If Compliance Coach breaches a material term of this agreement and fails to remedy said breach within thirty (30) days, WaMu shall be entitled to a prorated refund of any and all fees paid to Compliance Coach for the current Term year and to cancel any subsequent Term. If WaMu breaches a material term of this agreement, Compliance Coach shall be entitled to suspend the remainder of any remaining Term of the agreement and to retain any and all fees that have been paid or are payable to Compliance Coach; or

(b)    Upon written notice by either Party, immediately, if (i) a receiver is appointed for the other Party or its property; (ii) the other Party becomes insolvent or unable to pay its debts as they mature in the ordinary course of business or makes a general assignment for the benefit of its creditors; or (iii) any proceedings (whether voluntary or involuntary) are commenced against the other Party under any bankruptcy or similar law and such proceedings are not vacated or set aside within sixty (60) days from the date of commencement thereof.

(c)    This Agreement and/or any Exhibit may be terminated immediately, in whole or in part, by WaMu for its convenience at any time, by WaMu giving Compliance Coach thirty (30) calendar days' notice. In the case of such termination for convenience, all remaining license fees for the Agreement Term owed to Compliance Coach shall become immediately due and payable.

3.3    Post Termination. From and after termination:

(a)    All sums owed to Compliance Coach by WaMu shall become immediately due and payable upon the effective date of termination;

(b)    All licenses granted hereunder shall terminate;

(c)    Each Party shall immediately cease use of all Proprietary or Confidential Information belonging to the other Party and shall irretrievably delete and/or remove such items from all computer hardware and storage media, including backups.

## 4.0    COMPENSATION

a.    Fees. Subject to Compliance Coach's performance of the Services hereunder, WaMu shall compensate Compliance Coach as set forth in the applicable Schedule. These fees shall be Compliance Coach's only compensation for Services. Compliance Coach shall not proceed with or be reimbursed for any Services that: (i) have not been authorized in advance by a WaMu Representative in connection with an applicable SOW; and/or (ii) exceed any budget or expenditure limit set forth in an applicable SOW.

b.    Invoices. Compliance Coach shall invoice WaMu on a quarterly basis for Services in accordance with the milestone schedule (if any) set forth in the applicable Schedule. Compliance Coach shall submit invoices to the address and WaMu Representative set forth in the applicable Schedule, unless Compliance Coach is established as a vendor on WaMu's eProcurement system, in which case Compliance Coach shall follow WaMu's policies with respect to submission of electronic invoices. All invoices must include a detailed statement of the Services and/or Deliverables covered by such invoice, and reference this Agreement, the applicable Schedule number, and the purchase order number (if any) set forth in the applicable Schedule. WaMu shall pay Compliance Coach all undisputed portions of correct and complete invoices for Services that meet Specifications within fifteen (15) days

after receipt of the invoice or in accordance with any payment schedule set forth in the applicable Schedule. Compliance Coach shall be deemed to have waived all charges, fees and approved expenses that are not invoiced within ninety (90) days after the end of the calendar year in which the charges were incurred.

c.   Expenses. Out-of-town travel expenses that are pre-approved in writing and are reasonable and necessary shall be reimbursed at actual cost without markup. In no event shall WaMu pay for travel time. Airfares must be at coach rates, although Compliance Coach may choose to upgrade at its own expense. Where practical, airfares shall be booked at least seven (7) days in advance. Daily meal allowance is $35 per day ($50 per day in New York and Illinois) per Compliance Coach personnel providing Services hereunder. Ground transportation shall be reimbursed at actual cost, not to exceed $40 per Compliance Coach personnel per day. Unless otherwise agreed in writing, hotels shall be reserved using WaMu's designated hotels where discounts have been negotiated.

d.   Taxes. WaMu is responsible for all applicable taxes, duties or other charges, including sales or use taxes, imposed by any federal, state or local governmental entity on Services furnished by Compliance Coach under this Agreement, except for taxes based on Compliance Coach's net income, gross revenue or employment obligations. If Compliance Coach is obligated by applicable law or regulation to collect and remit any taxes relating to the Services (except for taxes based on employment obligations), then Compliance Coach shall add the appropriate amount to WaMu's invoices as a separate line item. Compliance Coach shall indemnify, defend and hold WaMu harmless from and against any interest, penalties or other charges resulting from the non-payment or late payment of taxes or other charges for which Compliance Coach failed to invoice WaMu or which Compliance Coach otherwise failed to pay in a timely manner.

**5.0    CONFIDENTIALITY AND CONSUMER PRIVACY**

a.   Definition. "Confidential Information" of a Party means all confidential or proprietary information, including all information not generally known to the public, the terms of this Agreement and WaMu Data. "WaMu Data" shall mean all data and information that is submitted, directly or indirectly, to Compliance Coach by WaMu or obtained or learned by Compliance Coach in connection with the Services provided by Compliance Coach under this Agreement and any Schedule, including information relating to WaMu's customers, technology, operations, facilities, consumer markets, products, capacities, systems, procedures, security practices, research, development, business affairs, ideas, concepts, innovations, inventions, designs, business methodologies, improvements, trade secrets, copyrightable subject matter and other proprietary information. All WaMu Data is and shall remain the property of WaMu and shall be protected as described in this Section 5. Without limiting the foregoing, Confidential Information shall include all such information provided to each Party by the other Party both before and after the date of this Agreement.

b.   Use and Disclosure. All Confidential Information relating to a Party shall be held in confidence by the other Party to the same extent and with at least the same degree of care as such Party protects its own confidential or proprietary information of like kind and import, but in no event using less than a reasonable degree of care. Neither Party shall disclose, duplicate, publish, release, transfer or otherwise make available Confidential Information of the other Party in any form to, or for the use or benefit of, any person or entity without the other Party's prior written consent. Each Party shall, however, be permitted to disclose relevant aspects of the other Party's Confidential Information to its officers, agents, subcontractors, employees and servants to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations under this Agreement and such disclosure is not prohibited by the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. §6801, et seq.), as it may be amended from time to time (the "GLB Act"), the regulations promulgated thereunder or other applicable law. Each Party shall establish commercially reasonable controls to ensure the confidentiality of the Confidential Information and to ensure that the Confidential Information is not disclosed contrary to the provisions of this Agreement, the GLB Act or any other applicable privacy laws and regulations. Without limiting the foregoing, each Party shall, at a minimum, implement such physical and other security measures as are necessary to: (i) ensure the security and confidentiality of the Confidential Information; (ii) protect against any threats or hazards to the security and integrity of the Confidential Information; and (iii) protect against any unauthorized access to or use of the Confidential Information. If applicable, Compliance Coach shall also comply with the Information Security Requirements of WaMu, attached as Schedule D to this Agreement. To the extent Compliance Coach receives or obtains nonpublic personal information (as defined in the GLB Act) of WaMu's customers, Compliance Coach shall, at a minimum, establish and maintain such data security program as is necessary to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information as set forth in the Code of Federal Regulations at 12 C.F.R. Parts 30, 208, 211, 225, 263, 308, 364, 568 and 570. To the extent that a Party hereto delegates any duties and responsibilities under this Agreement to an agent or other subcontractor in accordance with the terms hereof, such Party ensures that such agents and subcontractors shall adhere to the same requirements with which such Party is required to comply under this Agreement.

c.  Exceptions.  The obligations in Section 5 (b) above shall not restrict any disclosure by either Party (a) pursuant to any applicable law, or by order of any court or government agency (provided that the disclosing Party shall give prompt notice to the non-disclosing Party of such order and shall cooperate at the disclosing Party's expense in any effort to comply with or to contest the order); or (b) to either Party's accountants, legal advisors, auditors and financial advisors.  Further, the obligations in Section 5 (b) above shall not apply with respect to information that: (i) is developed by the other Party without violating the disclosing Party's proprietary rights; (ii) is or becomes publicly known (other than through unauthorized disclosure); (iii) is disclosed to, or learned by, the recipient from a third Party free of any obligation of confidentiality; and/or (iv) is already known by such Party without an obligation of confidentiality other than pursuant to this Agreement or any confidentiality agreements entered into before the Effective Date between WaMu and Compliance Coach.  If the GLB Act, the regulations promulgated thereunder or other applicable law now or hereafter in effect imposes a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Section 5.

d.  Disclosure of Confidential Information.  In the event of a breach of this Section 5 or other compromise of WaMu Confidential Information of which Compliance Coach is or should be aware (whether or not resulting from a breach), Compliance Coach shall immediately notify WaMu in a writing detailing all information known to Compliance Coach about the compromise, the WaMu Confidential Information affected, and the steps taken by Compliance Coach to prevent the recurrence of such breach and to mitigate the risk to WaMu.  Such notice shall be sent to the address indicated in the Notice section of this Agreement, including a copy to the Chief Legal Officer as identified therein.  If and to the extent that any compromised WaMu Confidential Information includes any customer data, Compliance Coach shall also identify the customers and customer information affected.  Compliance Coach shall provide WaMu with access to all information related to the security breach as reasonably requested by WaMu.

e.  Return of Materials.  Upon request and/or upon termination of this Agreement for any reason, Compliance Coach shall return, destroy or cause the destruction of, any and all records or copies of records relating to WaMu or its business, including Confidential Information (except for Confidential Information of WaMu that is rightfully contained in Compliance Coach's work papers, provided that Compliance Coach maintains the confidentiality of such Confidential Information as required herein) according to WaMu's instructions or relevant industry best practices if no instructions are provided.  Upon request, Compliance Coach shall certify in writing that all such Confidential Information has been so returned or destroyed.

f.  Consumer Privacy.  Compliance Coach acknowledges to WaMu that:  (i) WaMu has a privacy policy (available on WaMu's website at www.wamu.com or successor website) designed to communicate to WaMu's customers and consumers (as defined in the GLB Act) its policies and procedures regarding its use of nonpublic personal information (the "Privacy Policy"); and (ii) Compliance Coach has received, read and understood the terms of the Privacy Policy as of the Effective Date.  Compliance Coach shall be responsible for periodically reviewing the Privacy Policy during the Term of this Agreement.

g.  Language Conflict.  In the event of a conflict between the Information Security Requirements and the provisions of this Section 5, whichever is more stringent, in WaMu's opinion, shall control.

## 6.0   INSURANCE

a)  Coverage Requirements.  During the Term of this Agreement, and for three (3) years thereafter, Compliance Coach shall maintain the following insurance coverages with insurance carriers with an A.M. Best rating of at least A-VII, or such other insurance carriers:  (i) all insurance coverages required by federal, state or local law, including statutory worker's compensation insurance and employers' liability insurance (and such employers' liability insurance shall provide a limit of at least $500,000 for each person); (ii) comprehensive or commercial general liability insurance (which shall provide for a minimum combined bodily injury and property damage coverage limits of $2,000,000 per occurrence and shall name WaMu as an "additional insured"); (iii) comprehensive automobile liability covering all vehicles that Compliance Coach owns, hires or leases in an amount not less than $1,000,000 (and naming WaMu as an "additional insured"); (iv) a comprehensive crime policy with a limit of $2,000,000 that shall include Fidelity Bond/Employee Crime, employee dishonesty and fidelity coverage for all Compliance Coach employees, officers and agents, computer system fraud, and "on-premises" loss (loss inside the premises) and "in-transit" loss (loss outside the premises).

b)  Additional Requirements.  Within fifteen (15) days after WaMu's request, Compliance Coach shall provide WaMu with a complete copy of any policy (including declaration page) required by this Agreement.

## 7.0    LIMITED WARRANTIES

**7.1    Performance Warranty.** Compliance Coach warrants that the Web Services shall perform in all material respects with the documentation for such Web Services.

**7.2    Exclusive Remedy.** Except as provided under subparagraph (a) of the Termination section, the exclusive remedy of WaMu against Compliance Coach for breach of the warranties provided in this Section shall be to seek repair or replacement of the affected Web Services. Compliance Coach shall, at no additional cost to WaMu, use commercially reasonable efforts to resolve breaches of the foregoing warranties. The warranties provided in this Section are solely for the benefit of WaMu and WaMu shall have no authority to extend such warranties to any third Party. Compliance Coach shall not be liable for failures caused by WaMu's or any third Party hardware and software, misuse of the Web Services, or the negligence or willful misconduct of WaMu.

**7.3    Compliance Coach Representations and Warranties.** Compliance Coach represents and warrants to WaMu that:

a) Compliance Coach is duly organized, validly existing, has full and adequate power to own its property and conduct its business as now conducted, is in good standing and duly licensed, and has procured all necessary licenses, registrations, approvals, consents and any other communications in each jurisdiction as required to enable Compliance Coach to perform its obligations under this Agreement;

b) The execution, delivery and performance of this Agreement by Compliance Coach and the performance by Compliance Coach of the transactions contemplated in this Agreement have been duly and validly authorized by all necessary action, corporate or otherwise, on its part, and this Agreement and each Schedule constitute the valid, legal and binding obligation of Compliance Coach;

c) Compliance Coach is not and will not be subject to any agreement or other constraint that does, would, or with the passage of time would, prohibit or restrict Compliance Coach's right or ability to enter into, or carry out, its obligations hereunder;

d) Compliance Coach has the qualifications and the ability to perform the Services in a professional manner without the advice, control or supervision of WaMu. Compliance Coach shall provide consultants, technicians and/or technical personnel trained to perform the Services in the applicable SOW. All workmanship and, if required, materials or documentation provided by Compliance Coach shall be of the highest quality in every respect and according to the Specifications and any mutually agreed to schedule set forth in the applicable SOW;

e) Compliance Coach possesses all the legal right, title or interest in or to any intellectual property (such as software, designs, copyrights, patents, trademarks and trade secrets) that have been or shall be used to create or be a part of the Deliverables;

f) Neither the Services nor the Deliverables, nor any part, product or software sold, distributed, licensed or supplied by Compliance Coach in connection with the Services or Deliverables, do or shall infringe any patent, copyright, trademark or other proprietary right of any third Party or misappropriate any trade secret of any third Party;

g) Compliance Coach's performance of the Services called for by this Agreement does not and shall not violate any applicable law, rule or regulation;

h) The Deliverables shall perform according to the Specifications;

i) To the extent the Deliverables include software, the software, including updates, upgrades and new versions, does not and shall not contain any viruses, malicious code, trojan horse, worm, time bomb, self-help code, back door or other software code or routine designed to: (i) damage, destroy or alter any software or hardware; (ii) reveal, damage, destroy or alter any data; (iii) disable any computer program automatically; or (iv) permit unauthorized access to any software or hardware;

j) Time is of the essence in connection with Compliance Coach's performance of the Services and delivery of the Deliverables;

k) Any software provided as part of the Deliverables or the Services contains no third-Party software or any software that may be considered "Free and Open Source Software" or "FOSS," where "FOSS" means any software that users are allowed to run, study, copy, modify and redistribute without restriction, and for which access to source code is a prerequisite to its use, and for which users may or may not be required to pay a fee to use the software;

l) Except for restrictions on trade with countries against which the United States government has imposed a general embargo, there is no restriction on the export of any of the Deliverables or any software contained therein; and

m) With respect to WaMu Confidential Information that Compliance Coach has in its possession, Compliance Coach shall maintain, at a minimum, reasonable and customary security measures applicable to the manner in which Compliance Coach possesses such information (e.g., physically, electronically or otherwise) to protect the WaMu Confidential Information from disclosure or breach.

n) Compliance Coach has revealed all financial interests related to any hardware, software or services or provider thereof that Compliance Coach might recommend to WaMu.

## 8.0    EXCLUSION OF WARRANTIES

EXCEPT AS PROVIDED IN THE LIMITED WARRANTIES SECTION, THE WEB SERVICES ARE PROVIDED TO WAMU "AS IS," WITHOUT WARRANTY OF ANY KIND, EXPRESS AND IMPLIED INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR THE PARTICULAR PURPOSE. COMPLIANCE COACH DOES NOT WARRANT THAT THE WEB SERVICES WILL MEET WAMU'S REQUIREMENTS OR THAT THE OPERATION OF THE WEB SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY COMPLIANCE COACH OR COMPLIANCE COACH'S AUTHORIZED REPRESENTATIVES SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THIS WARRANTY.

WAMU ASSUMES FULL RESPONSIBILITY FOR WAMU'S USE OF THE WEB SERVICES AND USE OF THE INTERNET.  COMPLIANCE COACH SHALL NOT HAVE ANY LIABILITY UNDER ANY PROVISION OF THIS AGREEMENT OR OTHERWISE WITH RESPECT TO ANY PERFORMANCE PROBLEM, CLAIM OF INFRINGEMENT OR OTHER MATTER TO THE EXTENT ATTRIBUTABLE TO ANY UNAUTHORIZED OR IMPROPER USE OR MODIFICATION OF THE WEB SERVICES, OR ANY UNAUTHORIZED COMBINATION OF THE WEB SERVICES WITH PRODUCTS AND SERVICES PROVIDED BY THIRD PARTIES.  WAMU ACKNOWLEDGES AND AGREES THAT COMPLIANCE COACH DOES NOT OPERATE OR CONTROL THE INTERNET AND WAMU FURTHER RECOGNIZES THAT IRRESPECTIVE OF COMPLIANCE COACH'S PERFORMANCE: (i) VIRUSES, WORMS, TROJAN HORSES, OR OTHER UNDESIRABLE DATA OR SOFTWARE MAY ADVERSELY AFFECT THE WEB SERVICES; AND (ii) UNAUTHORIZED USERS (e.g., HACKERS) MAY ATTEMPT TO OBTAIN ACCESS TO WAMU'S DATA, WEB-SITES, COMPUTERS, OR NETWORKS.

## 9.0    LIMITATION OF LIABILITY

IN NO EVENT SHALL COMPLIANCE COACH BE LIABLE TO WAMU OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES FOR LOSS OF BUSINESS, LOSS OF PROFITS, LOSS OF GOODWILL OR BUSINESS REPUTATION, BUSINESS INTERRUPTION, LOSS OF DATA, OR LOSS OF BUSINESS INFORMATION) ARISING OUT OF OR CONNECTED IN ANY WAY WITH THIS AGREEMENT, OR FOR ANY CLAIM BY ANY THIRD PARTY, EVEN IF COMPLIANCE COACH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 10.0    FORCE MAJEURE

Except for the payment of money as described in the Payment Obligations Section of this Agreement, neither Party shall be liable for any failure or delay in performance under this Agreement which is due to any event beyond the reasonable control of such Party, including without limitation, fire, explosion, unavailability of utilities or raw materials, Internet delays and failures, telecommunications failures, unavailability of components, labor difficulties, war, riot, act of God, export control regulations, laws, judgments or government instructions.

## 11.0    NOTICES

All notices, demands or consents given under this Agreement shall be in writing and shall be deemed given when delivered by certified, registered mail or by overnight courier to the receiving Party at the address stated in this Agreement or at such other address given by either Party to the other in writing.

## 12.0    OTHER

12.1    Waiver.  No term or provision hereof shall be considered waived by either Party, and no breach excused by either Party, unless such waiver or consent is in writing signed by the Party against whom the waiver is asserted.  No consent by either Party to, or waiver of, a breach by either Party, whether express or implied, shall constitute a consent to, waiver of, or excuse of any other, different, or subsequent breach by either Party.

12.2    Severability.  If any part of this Agreement is found invalid or unenforceable, that part shall be amended to achieve as nearly as possible the same economic effect as the original provisions and the remainder of this Agreement shall remain in full force.

12.3    Assignment.  This Agreement shall not be assigned by either Party without the prior written consent of the other except as follows:

    (a)  Compliance Coach may assign this Agreement provided such assignment (i) is in writing, and (ii) states that the assignee is accepting all obligations of Compliance Coach under this Agreement and agrees to be bound by and discharge the Agreement's terms, conditions, and obligations as if it were the original Party hereto.

    (b)  WaMu may assign this Agreement to a parent or subsidiary corporation, or in the event of an affiliation, merger, acquisition, sale or disposition of substantially all of its assets, provided such assignment (i) is in writing, and (ii) states that the assignee is accepting all obligations of WaMu under this Agreement and agrees to be bound by and to discharge each of the Agreement's terms, conditions, and obligations as if it were the original Party hereto.

12.4    Independent Contractor.  WaMu acknowledges that Compliance Coach is at all times acting as an independent contractor under this Agreement and except as specifically provided herein, not as an agent, employee, or partner of WaMu.  Neither Party has authority, express or implied, to make any obligation or commitment on behalf of the other.

12.5    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supersedes all prior or simultaneous representations, negotiations, and agreements, whether written or oral, and all industry customs or trade practices.  Neither Party has executed this Agreement by reason of or in reliance on any representations which are not fully stated in this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement and intend it to be effective as of the Effective Date.

Compliance Coach, Inc.                                 Washington Mutual Bank

By:  _Sai Huda_                                        By:  _Brully Cuy_

Title:  _CEO_                                          Title:  _SVP_

Date:  _7/21/08_                                       Date:  _7/17/2008_

Address:    4370 La Jolla Village Drive       Address:  Attn: General Counsel
            Suite 400                                   1301 Second Ave.  m/s wmc 3501
            San Diego, CA  92122                        Seattle, WA  98101

**Schedule A**
**Web Services, Users & Fees**

1.    **Description of Services**

Compliance Coach will deliver the Web Services to WaMu via Internet access to Regulatory University™ ("www.regulatoryu.com") hosted at a secure, private server exclusively for WaMu's use, for the Agreement Term.

a.    A library of fifteen (15) interactive Web-based regulatory compliance training courses on key regulatory compliance topics, of WaMu's choice as listed in Section 9 of this Schedule to include among others:

- Anti-Money Laundering (BSA, USA Patriot Act)
- OFAC
- Gramm-Leach-Bliley Act (GLBA)
- Information Security Guidelines
- FCRA
- Identity Theft
- COPPA
- Mortgage Lending – Purchase Money, Refinance, Subordinate Loans, HELOC courses covering TILA, ECOA, FHA, FCRA, RESPA, FDPA etc.
- Insurance
- Investments
- Deposits (Reg. D; Reg. DD; Reg. CC; Reg. E)
- Predatory Lending
- HMDA Reporting
- Fair Lending
- Loans to Insiders (Reg. O)

Compliance Coach shall use commercially reasonable methods to ensure the courses are accurate and free of material defects and have the necessary elements to enable WaMu's compliance with applicable regulations.

New Training modules will be available as they are released. WaMu's system will be updated automatically with the additional content at no charge.

Compliance Coach will customize any of the library courses per WaMu's request, as needed, at no additional charge. Additionally, Compliance Coach will provide consulting services at no additional charge to develop a best practices-based curriculum assignment plan for WaMu to deploy courses enterprise-wide based on job functions or roles.

At its option, WaMu may choose 50 Customized BSA/AML + Other Compliance Topics Training Courses per the Optional Fee Schedule set forth in Section 9 below.

b.    Learning Management Center –
- Automated scoring, tracking, and analytical reporting to document an audit trail of regulatory compliance and measure learning performance.
- Integration with WaMu's internal Learning Management System at no additional charge, should such services be required.
- Online "Custom Content Manager" to enable WaMu to create customized regulatory compliance training courses on its internal policies and procedures, along with automated Tests to score and document Users' learning. Customization feature also allows WaMu to create Frequently Asked Questions relating to internal policies and procedures.
- Online learning management tools such as the Survey Wizard, Synchronous Instructor led Easel Tool, Automated Curriculum Assignment System and Secure Repository.

c.    Expert Views – Access to expert opinions via monthly e-mails, up to three per month. Also, archived web-casts on pertinent regulatory issues with key regulatory agencies commenting on recent rulings and interpretations.

d.    Knowledge Vault of frequently asked questions and answers, sanitized to protect client privacy and confidentiality. Currently contains over 500 FAQ's. Also updated periodically.

e. <u>Regulatory Tools</u> – Library of online Regulatory Resources and Web Site links relating to laws and regulations. Also, various online tools and checklists that help an institution assess compliance with regulations, create mandated policies, disclosures, etc.

### 2.    Legal Disclaimer

The online regulatory compliance training services provided by Compliance Coach is general information only. Compliance Coach shall use commercially reasonable efforts to ensure that the information provided is accurate and timely, however the information provided is not legal advice. If legal advice is required, the services of a competent professional person should be sought.

### 3.    Compliance Coach's Support Obligations

During the Term, Compliance Coach shall provide the following maintenance and support for the Web Services:

a. Provide a Customer Care Manager to serve as the project manager and to oversee day to day customer support and training roll out. This professional will also manage the initial orientation and ongoing training of WaMu system administrators.

b. Provide WaMu 24 x 7 automated e-mail user login support. Additionally, reasonable telephone and e-mail technical support. Compliance Coach's e-mail and telephone support is available Monday through Friday, 8 am to 5 pm PST, excepting Federal legal holidays. The Parties shall collectively review support usage at least twice each year.

c. Compliance Coach shall not be responsible for providing maintenance and support services for items of software and hardware that it does not provide under this Agreement.

d. Compliance Coach shall ensure proper production and storage of daily backups of WaMu's data stored on Compliance Coach's web site.

e. Use commercially reasonable efforts to promptly correct reproducible significant programming errors in the Web Services that WaMu has identified, classified, and reported to Compliance Coach.

f. Compliance Coach shall provide to WaMu notification of any planned outages on the Compliance Coach Website. When possible, at least ten (10) business day's advance notice of planned outages shall be given to WaMu. Compliance Coach shall not schedule maintenance during a Business Day (defined for this purpose as the period from 7 a.m. to 7 p.m. PT, Monday through Friday).

g. Compliance Coach will operate and maintain the Compliance Coach site in a secure environment with system support, appropriate redundancy and periodic backup. In case of an interruption or failure of any of the Services furnished on the Compliance Coach site, including but not limited to power, back-up power, HVAC, transmission and Internet services, Compliance Coach shall use commercially reasonable efforts to restore service as soon as possible.

h. In the event that the Services are unavailable due to problems caused by any defect or malfunction within the control of Compliance Coach, resulting in downtime of more than two (2) consecutive hours, upon notice by WaMu of such downtime, Compliance Coach will use best efforts to respond within one (1) hour during a "Business Day" (defined for this purpose as the period from 7 a.m. to 7 p.m. PT, Monday through Friday), and within four (4) hours during the weekend, on a national holiday, or after normal business hours on a Business Day. Downtime shall not include any network unavailability during Compliance Coach's scheduled maintenance as permitted by this section or issues beyond the reasonable control of Compliance Coach. If Compliance Coach's downtime exceeds thirty-six (36) consecutive hours at any time, then WaMu in its sole discretion can terminate this Agreement. In such event, WaMu shall not be obliged to make any payments to Compliance Coach with respect to amounts invoiced after the date of termination, but shall be obliged to pay all amounts invoiced by Compliance Coach for services performed prior to the date of termination. Compliance Coach agrees to provide WaMu with a refund on a prorated basis of fees prepaid for the Services terminated as a result of such breach of this Section. Compliance Coach shall periodically provide automatic upgrades, as available to its customers, to improve WaMu online experience or improve functionality. Compliance Coach shall provide continuous, 24-hour-a-day-and-7-day-per-week monitoring of its Website and use commercially reasonable efforts to promptly remedy any problems and maintain operation of the system within the highest industry standards.

i. Upon notification of a problem or request, Compliance Coach will identify and classify the problem or question. Compliance Coach will contact WaMu by voice mail or e-mail and will provide an estimated time to repair or solve the problem or inquiry in accordance with the Response Times set forth below.

    1) Error Response Times:

a) "Error" means a material failure of the Compliance Coach services, which failure is demonstrable in the environment for which the Compliance Coach services were designed and causes it to be inoperable or to operate improperly in the environment for which it was designed and is within Compliance Coach's reasonable control to correct. Failures or problems resulting from WaMu's or its End Users' negligence or improper use of the Compliance Coach services, modifications or damage to the Compliance Coach services by Licensee or its End Users, and use of the Compliance Coach services on hardware not certified by Compliance Coach as compatible, are not considered Errors. Error shall not include defects or failures due to reasons outside of Compliance Coach's reasonable control or within WaMu's or WaMu's third Party learning management system provider's reasonable control.

b) "Error Correction" means a procedure or routine that, when observed in the regular operation of the Compliance Coach services, avoids the practical adverse effect of such nonconformity.

2) Compliance Coach will correct any Error reported by WaMu in accordance with the priority level reasonably assigned to such Error by Compliance Coach. The following definitions will apply to such prioritization:

a). "Priority 1 Error" means an Error that renders the Compliance Coach services inoperative or severely impairs the use of the Compliance Coach services.

b). "Priority 2 Error" means an Error that degrades the performance of or restricts use of the Compliance Coach services or an important feature of the Compliance Coach services.

c). "Priority 3 Error" means an Error that causes only a minor impact on the use of the Compliance Coach services.

3) Response Time:

a). "Priority 1 Error": Response within 4 hours/repair within one business day
b). "Priority 2 Error": Response within 4 hours /repair within two business days
c). "Priority 3 Error": Response within 2 days/repair within five business days

The response will be made by a Compliance Coach representative with the skill set sufficient to resolve the problem. WaMu will submit to Compliance Coach any data that Compliance Coach may reasonably require to reproduce or assess the Error and the operating conditions under which the Error occurred. Compliance Coach will provide a written communication to WaMu, via e-mail, confirming the resolution within a commercially reasonable time.

**4.    Systems Development & Maintenance:**

a.   Compliance Coach represents and warrants that it has developed and engineered its software without any undocumented application code that bypasses any security features. If there are such accesses, Compliance Coach agrees that it will identify those accesses to WaMu and will remove them without charge to WaMu. If Compliance Coach is using licensed software from another service provider, Compliance Coach agrees to obtain the same written representation and warranty from that third Party software service provider.

b.   Compliance Coach agrees there will be no extraneous access from platforms or use of protocols other than those in the current configuration presented to WaMu by Compliance Coach.

c.   Compliance Coach agrees to maintain all relevant application and system logs and that Compliance Coach will copies of any pertinent logs to help diagnose and resolve any incidents.

**5.    Telecommunication & Network Security**

a.   Both parties shall implement commercially reasonable security measures at each other's respective ends of the connection to protect against unauthorized traffic to pass into the other parties networks through the common Internet connection. WaMu reserves the right to disconnect the Compliance Coach service if unauthorized access is discovered. This does not, however, relieve Compliance Coach of its commitment to perform under the Agreement to which this Schedule is attached. Such performance will continue by Compliance Coach's providing either on-site servicing or a WaMu-acceptable workaround until the inappropriate access can be investigated and resolved to the satisfaction of WaMu. Compliance Coach agrees that any server access required by the Compliance Coach staff through outside security products will be in a READ only mode unless there has been prior, written approval of a security plan for more intrusive access.

**6.    Disaster Recovery and Business Continuity**

Compliance Coach agrees to provide WaMu with documentation of its disaster recovery strategy and/or capability. This description will address actions to be taken in the event of an extended outage of service. (Such an outage could be caused by a number of events ranging from technical hardware/software/network related malfunctions to a catastrophic disaster.) The description shall address:

- Risk avoidance and disaster prevention provisions in place (e.g. physical security systems, fire protection / suppression systems, equipment spare parts on-site, Uninterrupted Power Supply (UPS) and backup generators, etc.).
- Recovery time frames
- Data backup and off-site storage process.
- Lost WaMu Data / data in progress recovery.
- Service recovery strategy

- Notification process
- Recovery testing processes
- Recovery Plan maintenance
- Define recovery roles and responsibilities assumed by Compliance Coach and WaMu.

**7.     Monthly Usage Report**

On or before the fifteenth (15th) day of each calendar month, Compliance Coach may be required by WaMu to provide access to a Monthly Usage Report covering Service usage by Authorized Users during the preceding calendar month ("Reporting Period"). This Report will not be required if the SCORM method of deployment is selected by WaMu. The Monthly Usage Report will be delivered to a representative of WaMu designated in writing by WaMu. WaMu may, in its discretion, change the designated recipient(s) of the Monthly Usage Report from time to time. From time to time, WaMu's reporting requirements may change. Compliance Coach will accommodate WaMu's reasonable requests for additional reporting during the Term. There is only one annual license fee. There are no other fees (i.e. no course customization, integration, consulting, hosting, course maintenance, understands that they may, at their option, access the monthly usage reporting information set forth above by using the self reporting tool provided to them as part of the Services. The Monthly Usage Report will include the following minimum content:

a.    Total number of Authorized Users accessing each of the customized courses as of the last day of the Reporting Period;
b.    Total number of Authorized Users who have completed each of the customized courses during the Reporting Period;
c.    Total time each Authorized User spent accessing each of the customized courses during the Report Period;

**8.     Users**

During the term of the Web Services Agreement, WaMu shall have access to Regulatory University (www.regulatoryu.com) via the Internet for unlimited authorized WaMu Users.

**9.     Fees**

WaMu shall pay an annual license fee for the Web Services quarterly in advance. Such fees will be due and payable on the Effective Date of the Web Services Agreement and quarterly thereafter in accordance with the Agreement. There is only one annual license fee. There are no other fees (i.e. no course customization, integration, consulting, hosting, course maintenance, course updates or user fees.)

Compliance Coach shall provide WaMu with a fully customized BSA/AML course (each a "Course") for each of the 15 unique lines of business per the table below.

| | | |
|---|---|---|
| • ACH ATM | • Fraud Investigations-Audit Service | • Risk Mitigation |
| • BSA-AML Operations Group | • Home Loans | • Treasury & Capital Markets |
| • Card Services | • Line of Business Groups | • Wire Room |
| • Commercial | • Retail | • WM Insurance Services WMIS |
| • ECC | • Retail Sm. Business Lending | • WM Investments |

For each course, Compliance Coach will cover the topics listed below, as applicable to the job functions in each of the 15 business lines.

| Focus on BSA/AML and USA Patriot | Money Services Businesses | High Risk Persons and Entities |
|---|---|---|
| Money Laundering | Foreign Relations | High Risk Products and Services |
| Red Flags of Money Laundering | Investigator and Analysis Training | High Risk Geographic Locations |
| BSA/AML Compliance Program | Information Sharing | Flood Disaster Protection |
| Currency Transaction Reports (CTRs) | Customer Identification Program (CIP) | Fair Lending Act |
| Suspicious Activity Reports (SARs) | Customer Due Diligence (CDD) | Privacy (GLBA) |
| Monetary Instruments Logs (MILs) | Office of Foreign Assets Control (OFAC) | Nondeposit Investment Products |
| Funds Transfers | OFAC Program | Cayman Island Facility/Products |

Should WaMu prefer to roll out a fewer number of courses, Compliance Coach will identify creative ways to consolidate and reduce the number of courses. Either way, Compliance Coach has the flexibility and technology resources to meet WaMu's needs and preferences.

Each course will be deployed via SCORM or AICC integration, per WaMu's preference.

Additionally, Compliance Coach will provide complimentary consulting services to assist WaMu with project management, developing a risk-based, best practices-based training strategy and plan, analysis of proposed curriculum to identify any gaps,

review of job functions and mapping to course content, benchmarking, pre and post deployment analysis and measurements and other training deployment services.

**Fee Schedule**

| Term | Content | Price |
|------|---------|-------|
| 24 months | 15 Customized BSA/AML Training Courses | $130,000 annual license fee, payable quarterly |

At its option, WaMu may choose to upgrade, effective September 30, 2008 to the following Fee Schedule.

**Optional Fee Schedule**

| Term | Content | Price |
|------|---------|-------|
| 24 months | 50 Customized BSA/AML + Other Compliance Topics Training Courses | $225,000 annual license fee, payable quarterly |

**Schedule B**
**Vendor Code of Conduct**

**Vendor Code of Conduct**

| | |
|---|---|
| **Owner Name:**  Contracts and Regulatory Group<br>Legal Department | **Effective Date:** 10/19/2004<br>**Revision Date:** 06/12/2007 |

## INTRODUCTION

WaMu's *Vendor Code of Conduct* (the "*Code*") extends to third party vendors ("Vendors") WaMu's commitment to conduct its business ethically and responsibly. As used in this *Code*, "WaMu" means Washington Mutual, Inc. and all of its direct and indirect subsidiaries and affiliates. As the context requires, "Vendor" includes a Vendor's respective employees, agents, suppliers, and subcontractors (who may also be referred to collectively as "Personnel"). The *Code* applies to all Vendors, regardless of which WaMu entity has engaged them. In the event of a direct conflict between this *Code* and Vendor's engagement contract with WaMu (the "Engagement Contract"), the provisions of the Engagement Contract on the matter in conflict shall govern. WaMu requires all Vendors and their Personnel to adhere to the letter and spirit of the *Code* at all times while they are performing services or otherwise transacting business with or on behalf of WaMu, regardless of whether their business activities occur at a WaMu workplace or elsewhere. The *Code* provides general guidance on issues that concern WaMu, but because the *Code* cannot and does not anticipate every ethical dilemma that might arise in connection with a Vendor's engagement, Vendors and their Personnel are expected to use common sense, good judgment, individual character, and integrity to determine proper conduct for issues not specifically addressed in the *Code* or in the body of the Vendor's Engagement Contract.

## BUSINESS PRACTICES

### Conflicts of Interest

WaMu considers a "conflict of interest" to be any situation in which a Vendor's or its Personnel's own interests compete with the business of WaMu or interfere with their obligations to WaMu. In their business dealings with or on behalf of WaMu, Vendor and its Personnel must always avoid actual, potential, or apparent conflicts of interest between Vendor and/or any of its Personnel and WaMu. Without limiting the generality of the foregoing, Vendors and their Personnel (a) shall not deal directly with any WaMu employee who holds, or whose spouse, domestic partner, or other family member or relative holds, a significant financial interest in the Vendor; and (b) shall not, in the course of negotiating the Vendor's Engagement Contract or performing the Vendor's obligations, deal directly with a spouse, domestic partner, or other family member or relative who is employed by WaMu.

The appearance of a conflict of interest can be as damaging to a Vendor and WaMu as an actual conflict. Therefore, it is important that all potential personal or business conflicts of interest be disclosed to a "Senior Manager" in the WaMu business unit that has engaged the Vendor, including those cases in which the Vendor or its Personnel are placed in a conflict of interest inadvertently. For purposes of this *Code*, references to a "Senior Manager" refers to a Senior Vice President or above; provided, however, that if the applicable Senior Manager is himself or herself the party to whom the relevant policy or prohibition under this *Code* applies (e.g., because he or she is being offered an item of value by Vendor, etc.), a Vendor should bring the matter to the attention of such Senior Manager's manager.

1

**Accepting or Offering Items of Value**

To avoid violation of law, violation of WaMu policy, and the appearance of impropriety, in the course of performing services for, or otherwise conducting business with or on behalf of, WaMu, a Vendor and its Personnel shall not: (a) solicit, encourage, or accept items of value (other than bona fide compensation paid by WaMu) from any WaMu employee or any third parties who are directly or indirectly related to the WaMu business activity in which the Vendor is engaged; or (b) offer items of value to any WaMu officers or employees (other than bona fide compensation, incentives, or credits paid by the Vendor to WaMu pursuant to the terms of the Vendor's Engagement Contract). This prohibition is effective even if the intentions of the person offering the item are innocent.

Notwithstanding the general prohibition above, and except as prohibited by applicable law or regulation (including, without limitation, the Real Estate Settlement Procedures Act) or the Vendor's Engagement Contract, WaMu recognizes the following limited situations in which items of value may be offered by Vendors or their Personnel to WaMu officers or employees, or accepted by Vendors or their Personnel from WaMu personnel or third parties who are directly or indirectly related to the WaMu business activity in which the Vendor is engaged, without actual or perceived risk of corruption or breach of trust:

(1)   The valuable item or benefit is given because of a familial or personal relationship independent of any business of WaMu; or

(2)   The valuable item or benefit is available to the general public under the same conditions upon which it is made available to WaMu employees or the Vendor or its Personnel; or

(3)   The valuable item is the type of promotional item or small gift that companies provide to their customers or business partners in the ordinary course of business (such as flowers accepted in recognition of a wedding, illness, or similar occasion), or the benefit is exchanged as a commonly accepted element of business practice (such as a meal accepted in the course of a bona fide business meeting), provided that this exception is subject to a dollar limitation of $250.00.

In addition, if a Vendor or its Personnel offers or accepts any item valued at greater than $100.00 but less than $250.00 under exception (3) above, the Vendor or its Personnel must promptly report the offer or acceptance of such item to the applicable Senior Manager in the business unit that has engaged the Vendor. Under no circumstances may a Vendor or its Personnel accept travel arrangements or other similar accommodations, or related meals, refreshments, or entertainment, paid for by anyone other than the Vendor or WaMu, where the furnishing of such items is in any way related to, or the result of, the Vendor's association with WaMu. Under no circumstances may a Vendor or its Personnel offer travel arrangements or other similar accommodations, or related meals, refreshments, or entertainment, to any WaMu employee without obtaining advance approval from such WaMu employee's Senior Manager.

In rare instances, circumstances may warrant acceptance by a Vendor or its Personnel of items exchanged as a commonly accepted element of business practice with a value over $250.00, or the offer by a Vendor or its Personnel to WaMu employees of such items. Acceptance by Vendor or its Personnel of such items in these circumstances requires the prior approval of a Senior Manager in the business unit that has engaged the Vendor. Prior to offering such items to a WaMu employee, Vendor or its Personnel shall obtain the approval of the WaMu employee's Senior Manager. If in connection with a Vendor's engagement for WaMu, the Vendor or its Personnel is/are offered any valuable item by a current or potential WaMu customer or vendor or if Vendor or its Personnel offers any valuable item to a WaMu employee under circumstances that do not fall within exceptions (1), (2), or (3) above, the nature and

2

estimated value of the item must be reported immediately upon receipt as follows: (a) for items offered to Vendor or its Personnel, to the applicable Senior Manager in the business unit that has engaged the Vendor; and (b) for items offered to a WaMu employee, the applicable Senior Manager in the business unit of the WaMu employee. If it is not possible to report such item immediately upon its receipt, it should be reported within three (3) business days of its receipt.

Cash should never be offered or accepted, regardless of the amount.

**Processing Personal Transactions**

Vendors and their Personnel are encouraged to take advantage of WaMu's products and services. However, Vendor Personnel may not process transactions that create a potential conflict of interest or security risk.

To the extent that any Vendor's engagement for WaMu may involve processing deposit or other banking service transactions, no Vendor Personnel may process their own deposit and/or other banking or credit card transactions, those of an immediate family member, or those of a close friend. For purposes of this Code, an "immediate family member" is defined as a Personnel's spouse or domestic partner, or either of their parent, son, daughter, sibling, grandchild, grandparent, niece, nephew, aunt, uncle, or a person living in the same household as such persons. While a Vendor's duties in the course of its engagement may enable its Personnel to have access to view their respective account balances on WaMu computer systems, such Personnel may not reverse fees, transfer funds, place or remove holds, process deposits, transactions, or payments, or perform any other maintenance on their accounts or those of an immediate family member or close friend.

To the extent that any Vendor's engagement for WaMu may involve loan origination or processing or the processing of credit card applications, no Vendor Personnel may take an application for a loan or credit card for themselves, an immediate family member, or a close friend. Likewise, they may not process or approve such loan or credit card application. If any Vendor Personnel, their immediate family member, or close friend wishes to take a loan from WaMu or apply for a credit card, they may do so through channels available to the general public. In addition to the foregoing, no Vendor Personnel may take an application for, process, or approve a real estate loan when they or an immediate family member has an ownership interest in any property that is used as collateral for the loan (regardless of whether the Vendor Personnel or their immediate family member is the seller or buyer of the property).

## PROTECTION AND PROPER USE OF RESOURCES

### WaMu Resources Generally

Vendors and their Personnel are expected to use WaMu's resources only in furtherance of WaMu business and to protect all resources under their control from theft, waste, or other loss. Proper protection includes, among other things, avoiding actions that are likely to damage or diminish the reputation of WaMu. Accordingly, neither a Vendor nor its Personnel may use WaMu resources for personal purposes (including in circumstances that may lead others to believe that such use is on behalf of, or endorsed by, WaMu), except where specifically allowed. Occasional, minimal use may be allowed under certain circumstances, but WaMu may request reimbursement from the Vendor for the direct costs associated with such use.

### WaMu Network and Systems

Vendors and their Personnel must comply with all WaMu security and privacy procedures and access and use policies as a condition of receiving access to WaMu's computer network (including requirements for maintenance of passwords) and to all other systems and buildings. All data stored or transmitted on equipment owned or leased by WaMu is to be considered

3

private and is the property of WaMu unless the Vendor's Engagement Contract expressly provides otherwise. WaMu may monitor all use of its corporate network and systems (including email) and/or access all data stored or transmitted using its network. WaMu-provided information systems (including email) may be used only for legitimate business-related purposes and in a manner that is otherwise consistent with the other provisions of this *Code*.

### Intellectual Property

Vendors and their Personnel are expected to respect the intellectual property ownership rights of WaMu and all third parties, including, but not limited to, copyrights, trademarks, patents, and trade secrets. Vendors and their Personnel shall use software, hardware, and any content only in accordance with applicable associated licenses or terms of use.

## HONESTY AND FAIR DEALING

### Honesty

WaMu expects Vendors and their Personnel to perform services for and otherwise conduct business with or on behalf of WaMu with absolute honesty and integrity.

### Fair Dealing

WaMu strives to ensure that all of its actions are guided by absolute honesty, integrity, and fairness. WaMu believes that cooperation, trust, and shared objectives are vital to its success. As a result, Vendors and their Personnel are expected to deal fairly with others, including, but not limited to, WaMu's customers, suppliers, competitors, and employees. Vendors and their Personnel may not take unfair advantage of others through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or other unfair business practices.

### Accuracy and Completeness of WaMu Records

Vendors and their Personnel are expected to maintain all WaMu records within their control in a complete and accurate manner. If a Vendor or its Personnel is/are responsible for creation or disposal of business records, they must do so honestly, accurately, and in full compliance with applicable legal and regulatory requirements. Accounts or other corporate records may not be structured so as to avoid reporting or signing authority requirements, nor may a transaction be misrepresented to make it appear more beneficial to WaMu, or anyone else, than it really is. Falsifying or misrepresenting WaMu accounts and records is considered by WaMu to be the equivalent of fraud.

### Theft

WaMu will not tolerate theft by its Vendors, their Personnel, or anyone else. WaMu considers a person to have committed theft if WaMu determines that the person misappropriated property, financial assets, or information belonging to WaMu, its customers, vendors, employees, or visitors. All such thefts must be reported to the appropriate regulatory agency and law enforcement officials, regardless of the dollar amount involved.

### Reporting Illegal or Dishonest Acts

Whenever a Vendor or its Personnel believes that someone working at or for WaMu (whether or not that person is a WaMu employee) has committed an illegal or dishonest act, or an act that causes, or is substantially likely to cause, harm to people or property or has violated a provision of this *Code*, they should report it to a Senior Manager in the business unit that has engaged them or as otherwise described in the "Interpretation of Code and Reporting Possible Violations" section at the end of this *Code*. Information reported will be held in strict confidence to the

4

extent reasonably possible.  Anyone who knows of but fails to report an illegal, dishonest, or harmful act or a violation of this Code may be considered a participant in the act or violation.

## VENDOR'S EMPLOYMENT PRACTICES

### Non-Discrimination

WaMu values and is committed to maintaining a diverse work environment where everyone can work together comfortably and productively so that new ideas and sound strategies may be implemented with enthusiasm.  WaMu strives to create and maintain an environment in which people are valued and appreciated for their contributions.  Therefore, WaMu expects all Vendors and their Personnel to treat each other, WaMu employees, and anyone else they come into contact with at a WaMu facility with respect.

WaMu prohibits discrimination against any of its employees, customers, or Vendors and their Personnel, particularly if the conduct is based on an individual's race, religion, color, sex, age, national origin, ancestry, marital status, sexual orientation, physical or mental disability, or any other characteristic protected by law.  WaMu will not tolerate such behavior, even if it is not so severe that it would be considered illegal under federal or state antidiscrimination laws.  Harassing conduct is prohibited even if the offender did not intend to offend or believed his or her conduct was welcome.  WaMu expects its Vendors to share its commitment to equal opportunity in the workplace and, accordingly, not to engage in any form of discrimination with respect to its Personnel.  Vendor may not threaten its Personnel or others with, or subject them to, harsh or inhumane treatment, including, without limitation, sexual harassment, sexual abuse, corporal punishment, mental coercion, physical coercion, or verbal abuse.

In the event a Vendor or its Personnel become aware of any behavior occurring at a WaMu facility or involving WaMu employees, agents, subcontractors, or suppliers that violates this section, Vendor shall immediately report such behavior to the WaMu employee designated as the recipient of notices under the Vendor's Engagement Contract, unless circumstances prevent such person from receiving notice of the violation, in which event the Vendor shall report the behavior to WaMu's Employee Relations Department at erinformation@wamu.net, and Vendor shall cooperate with WaMu to undertake an appropriate investigation and, if appropriate, corrective action.

### Drugs or Alcohol in the Workplace

WaMu strives to provide a drug-free work environment.  Vendor Personnel may not possess or use illegal drugs at the workplace or come to work under the influence of any substance, including alcohol, that may impair their abilities.  Individuals taking prescription medication are responsible for consulting with their pharmacists or physicians in advance regarding any likely effects of the medication on their job performance and for discussing any such effects with their supervisors.

Other than at appropriate WaMu-sponsored events, alcohol is not permitted in any WaMu workplace.

### Employment Practices for Vendors Operating Abroad

WaMu and its Vendors operate in a variety of jurisdictions throughout the world.  While WaMu expects and requires its Vendors to comply with all local laws and regulations pertaining to employment practices, jurisdictions with different cultural, political, or legal environments may permit employment practices contrary to the spirit and intent of this Code.  Accordingly, this section establishes basic employment practices requirements with which all Vendors must comply in order to provide services to or on behalf of WaMu.

5

<u>Forced or Compulsory Labor</u>.  WaMu believes it is inhumane to utilize forced, bonded, indentured, prison, or other compulsory labor, and WaMu will not work with Vendors who use such labor.  Vendor Personnel should not be required to lodge "deposits" or their identity papers with Vendor and should be free to leave their employment with Vendor after reasonable notice without penalty.

<u>Working Environment</u>.  Vendor shall provide a safe, clean, and healthy work environment, including, without limitation, clean restrooms; access to potable water; sanitary food preparation and storage facilities; well-lighted workstations and fire exits; safety equipment; and first aid material; and shall fully comply with all applicable safety and health laws, regulations, and practices.  Vendor shall take adequate steps to minimize the causes of hazards inherent in the working environment.

<u>Child Labor</u>.  WaMu does not and will not tolerate the use of child labor.  Vendor shall comply with all local minimum working age laws and requirements and not utilize child labor, and no Vendor Personnel shall be under the legal minimum working age of the respective region where such labor is performed.  Under no circumstances may a person under the age of 15 (or 14 where the law of the Vendor's country of operation allows), or younger than the age for completing compulsory education if such age is higher than 15, work in one of Vendor's facilities.  WaMu reserve the right to require a higher minimum age for Personnel working on WaMu matters.

<u>Wages and Benefits</u>.  Vendors must offer their Personnel fair compensation through wages and other benefits, in accordance with minimum wage requirements or prevailing local industry practice, whichever is higher.

<u>Working Hours</u>.  Vendors must comply with all applicable hour laws and regulations, including those related to overtime.

<u>Disciplinary Practices</u>.  WaMu will not tolerate its Vendors using corporal punishment or other physical or mental coercion.

## CONFIDENTIALITY AND USE OF COMPANY INFORMATION

### Confidentiality

In general, it is the responsibility of all Vendors and their Personnel to maintain the confidentiality of all Confidential Information (as defined in Vendor's Engagement Contract) in accordance with the specific terms and conditions set forth in Vendor's Engagement Contract (into which this *Code* may be incorporated).

Whenever a Vendor or its Personnel is/are in doubt as to the confidentiality or proprietary nature of information, they should consult with the applicable Senior Manager in the business unit that has engaged the Vendor prior to taking any action with such information.  In the event Confidential Information is handled in an unsecured manner or shared, intentionally or unintentionally, with an unauthorized party, the Vendor shall, within twenty-four (24) hours of such incident, notify WaMu at **CorpInformationSecurity@wamu.net** and call the **WaMu Security Operations Center at 888-497-3287.**

### Customer Privacy

Vendors and their Personnel may not access customer information, including information about a customer who is also an employee, except, and only to the extent, as expressly authorized in the Vendor's Engagement Contract.  Vendors and their Personnel must maintain confidentiality when sharing customers' personal financial information within WaMu or the Vendor organization, must use such information solely for the purposes set forth in the Vendor's

6

Engagement Contract, and may not share such information with other third parties except, and only to the extent, as expressly authorized in the Vendor's Engagement Contract.

To protect the privacy of WaMu's external and internal customers, Vendors and their Personnel who may have access to customer information should read and understand WaMu's *Privacy Policy* (posted online at www.wamu.com, or available on request for Vendors who do not have access to the online version). The Privacy Policy explains WaMu's practices for safeguarding, collecting, and sharing customers' non-public personal information and the circumstances under which WaMu may use this information.

### Insider Information

In the course of an engagement by or on behalf of WaMu, a Vendor and its Personnel may learn material non-public information about WaMu, its employees, its customers, or the companies with which it does business. For purposes of this *Code*, "material non-public information" means information that is not generally known or has not been made available to the public through appropriate means, such as a press release, where there is a substantial likelihood that a reasonable investor would consider such information important in deciding whether to buy, hold, or sell a security, including information that could reasonably be expected to affect the price of WaMu's stock. Such material non-public information may not be disclosed to anyone until it has been disclosed to the public nor may it be used for personal gain or disclosed to others to make investments based on the information. Vendors and their Personnel should be very careful when investing in or discussing WaMu, its customers, or the companies with which it does business so that their activities will not be perceived as insider trading or facilitating the insider trading activities of others.

## POLITICAL AND CIVIC ACTIVITIES AND CONTRIBUTIONS

### Activities and Contributions Generally

WaMu encourages Vendors and their Personnel to exercise their responsibility to vote and take an active interest in the issues of their communities. However, they may not display political symbols, distribute political literature, gather signatures on a petition, or otherwise engage in political activity at WaMu facilities or functions. They may not use envelopes or stationery printed with WaMu's name or address for political correspondence.

Vendors and their Personnel are free to make contributions to any political candidate or party, but (a) they may not make donations or present gifts in the name of WaMu; and (b) they must ensure that any recipient of a contribution understands that the contribution does not represent an endorsement from WaMu and is not intended to obtain any reciprocal benefit for WaMu.

### Lobbying Activities

Vendors and their Personnel may not undertake activities on behalf of WaMu that are designed to influence the decisions or actions of government officials in a manner that would require them or WaMu to register as a lobbyist, or employer of a lobbyist, without the prior written authorization of WaMu's Government and Industry Relations Department. Whenever there exists even the slightest doubt about whether certain conduct could require registration or reporting as a lobbyist, WaMu's **Government and Industry Relations Department, 206-500-4945**, should be contacted for guidance prior to engaging in the activity.

## COMPLIANCE WITH LAWS, RULES, AND REGULATIONS

As a financial services company, WaMu operates in a highly regulated business environment. Accordingly, Vendors and their Personnel are expected to understand, respect, and conduct all business activities in full compliance with all laws, regulations, policies, and procedures

7

applicable to the Vendor's business activities with and/or on behalf of WaMu.  If in doubt, a Vendor and/or its Personnel should consult the Vendor's legal counsel to determine and understand the applicability of the laws, regulations, and WaMu policies and procedures in a given situation.  In addition to any specific obligations in Vendor's Engagement Contract, Vendor and its Personnel shall, without limitation:

(1) Comply with all applicable trade control laws as well as all export, re-export, and import requirements;

(2) Conduct business in full compliance with antitrust and fair competition laws;

(3) Comply with all applicable environmental laws and regulations;

(4) Be honest, direct, and truthful in discussions with regulatory agency representatives and government officials;

(5) Not participate in international boycotts that are not sanctioned by the U.S. government or applicable laws; and

(6) Comply with applicable anticorruption laws, including, without limitation, the United States Foreign Corrupt Practices Act, and not authorize or make any direct or indirect payments or promises of payments to foreign government officials for the purpose of inducing the individual to misuse his/her position to obtain or retain business.

## COMPLIANCE WITH THIS CODE

All Vendors are responsible to educate and ensure that their Personnel understand this *Code* and to monitor and ensure compliance with the *Code* by such Personnel.  Further, a Vendor must promptly inform a WaMu Senior Manager in the business unit that engaged the Vendor if a violation of this *Code* has occurred.

## INTERPRETATION OF CODE AND REPORTING POSSIBLE VIOLATIONS

For additional guidance or answers to questions about how to interpret this *Code*, Vendors should contact a Senior Manager in the business unit that has engaged them.

To report fraud, theft, suspected criminal activities, illegal or dishonest acts, acts that cause, or are substantially likely to cause, harm to people or property, or other possible *Code* violations, Vendors may also contact **WaMu Corporate Security at 888-497-3287** or, to make an anonymous report, call the **WaMu Tip Line at 800-681-1400**.

Acting in a manner contrary to this *Code* may be deemed a breach of the Vendor's Engagement Contract.  This could subject a Vendor to termination of its Engagement Contract or could result in removal of individual Vendor Personnel from the WaMu project or workplace, depending on WaMu management's evaluation of the circumstances.  Even inadvertent violations of the *Code* may be considered extremely serious.

There will be no retaliation from WaMu or any of its employees against a person who presents in good faith what he or she believes to be evidence of a violation of this *Code* or of an illegal, harmful, or dishonest act committed by someone working for or on behalf of WaMu.

## CONCLUSION

WaMu thanks all of its Vendors and Vendor Personnel for their continuing commitment to upholding WaMu's principles and ethical standards.  WaMu may amend or otherwise modify this *Code* at any time.

6

**Schedule C**
**Working with WaMu**

## *Working with WaMu*
### (for contract staff working onsite)

### *About This Document*

Welcome to Washington Mutual. At Washington Mutual, we have a responsibility to our shareholders and customers to protect our valuable assets from loss or misuse. We also believe that it is important to communicate our expectations to staff hired through agencies or other vendors and directly as contractors. This document informs you about your responsibilities regarding confidentiality, security, use of company property, and other matters.

Signing this form is a prerequisite to working at any of our workplaces and being given access to our computer resources. By signing it, you acknowledge that you have read, understand, and agree to abide by the policies and terms contained or referred to in this form.

### *Confidential Nature of Work*

In connection with your performance of services for Washington Mutual ("Company" or "WaMu"), you may be entrusted with and have access to equipment, systems, and information related to our business and our customers, all of which are highly valuable assets of the Company. Examples of items that must be treated as confidential include, but are not limited to: business systems; access to systems; information about customers, vendors, and employment relationships; products; research and development material; customer accounts, including employee accounts; policies and procedures; and corporate decisions and future plans.

We consider all information about our business or customers that is not generally known to the public or to our

competitors to be confidential and protected as trade secrets under applicable law (collectively "Confidential Information"). This Confidential Information is a valuable asset of the Company, and protection of this asset is important to maintaining our competitive position in the financial services industry. It is the responsibility of all individuals who have access to Confidential Information to maintain its confidentiality and integrity both during and after his or her service with Washington Mutual. If you believe Confidential Information has not been properly protected or you are unsure of the confidential or proprietary nature of resources, consult WaMu management or call the Corporate Technology Solutions Center (Information Security option) at (877) WAMU-123 before taking any action.

### *Washington Mutual Security Statement*

It is critical that Washington Mutual protect its Confidential Information and its other assets and resources from loss, damage, or disruption due to unauthorized or inadvertent access, disclosure, or modification. Your responsibilities for protecting Company Information are detailed in our Information Security Policies and Standards that are relevant to the work you are performing for WaMu and/or to the WaMu resources to which you have access. The Information Security Policies and Standards are available from WaMu upon request or through your employer. If you become an authorized user of the Company intranet, they are also available through the Company Policies page at *http://collab.wamu.net/sites/005/Legal/Contracts/Exhibits/Working%20with%20WaMu%20for%20Contract%20Staff%20(2004).pdf.*

Some of your specific responsibilities under the Information Security Policies and Standards are summarized and confirmed below.

CONFIDENTIAL INFORMATION: I agree to maintain the confidentiality of all Confidential Information in accordance with the agreement under which I am performing services for WaMu. I will not directly or indirectly disclose any Confidential Information to anyone outside of the Company or to anyone inside the Company who does not have the need to know such information for business purposes. I understand and agree that this obligation to protect Confidential Information applies during the term of my assignment to provide services for the Company and continues after the termination of my assignment.

I will not alter or in any way change Confidential Information except in the performance of the duties of my job. I will not attempt to gain access to such information or data storage facilities unless I am specifically authorized to do so. I will not disable, bypass, or disregard security features or controls unless I am specifically authorized in writing by WaMu's Chief Information Security Officer to do so.

## *Working with WaMu*
### *(for contract staff working onsite)*

I will comply with WaMu Information Security Policies and Standards.

USER IDs AND PASSWORDS: I understand that I am responsible for the security of my password(s) and that any User IDs or passwords assigned to me are to be used only by me and are not to be disclosed to anyone, either directly or indirectly. I understand that I am responsible for all activities or transactions performed with my User ID(s) and password(s) on any workstation. I will not use a User ID or password assigned to another person.

I will comply with all WaMu procedures in the assignment and format of my passwords.

I will report any knowledge or suspicion of unauthorized attempts to breach security or knowledge of security loopholes to the WaMu Corporate Information Security Department at (206) 377- 1960 or the WaMu Tip Line at (800) 581-1400, or as otherwise directed in the agreement under which I am performing services for WaMu.

COMPUTING RESOURCES: Computing resources (including but not limited to e-mail, instant messenger, and internet access, as well as other software and hardware) may be provided to you for business use. While reasonable personal use of such resources is permissible (unless prohibited by an applicable license), any information stored on them is assumed to be the property of WaMu, and I have no expectation of privacy in any such information.

I understand that WaMu owns and has the right to access all electronic files maintained on Company equipment, including my electronic mail, computer files, and cache. The purpose for access could include quality assurance, maintenance, auditing, security and other investigations, debugging, and for other purposes the Company deems appropriate.

While it is not Company policy to routinely read e-mail and listen to voicemail on WaMu systems, I understand that the Company has the right to access my e-mail and voicemail and monitor my internet activities as it deems appropriate.

I will read and comply with the terms and conditions of applicable software licenses. I will not use personally-owned software on WaMu-owned computers, and I will not make or possess any unauthorized copies of copyrighted software on either WaMu premises or equipment.

I am aware that on my last day of service, or at Company discretion my access authorizations terminate; and I am to return WaMu Company access cards, badges, and all WaMu computer resources assigned to me.

### *Washington Mutual's Property*_____

| | |
|---|---|
| WORK AREAS: All WaMu computers, related equipment, software, access capabilities, storage facilities and contents are the sole property of Washington Mutual, as are all fixtures, furniture, equipment, supplies, and materials ("Company Property"). Company Property is provided for you to use while providing services to Washington Mutual. It is not intended for personal use. You may not enter any WaMu facility, room, or area for which you are not authorized unless escorted by a WaMu employee. You may not abuse your authority to gain access to any facility, room or area for which authorization has not been given. It is your responsibility to preserve and protect Company Property. You may not use Company Property for personal gain or other unauthorized purposes. Your responsibility to preserve and protect this property includes, but is not limited to, preventing unauthorized modification, damage, destruction, disclosure, use, or loss by you. | WaMu's RIGHT TO SEARCH / MONITOR: To protect Company Property, Confidential Information, our customers' assets (including their confidential information), the safety and security of staff and customers, and to ensure quality service, it may be necessary for the Company to: <br><br> □ Monitor work areas. <br> □ Conduct searches or inspections of work areas or property, including desks, lockers, papers, computers or personal property brought onto Company property, such as purses, briefcases, clothing, etc. <br><br> While it is not Company policy to routinely search staff, contractors, or their work areas, by accepting an assignment with Washington Mutual, you consent to such monitoring or searches and agree to cooperate with any investigation. |

*Working with WaMu*
*(for contract staff working onsite)*

### Using Personal Vehicles on Company Business_____

If you use your personal vehicle while on Company business during assignment with WaMu, you are responsible for having insurance, including bodily injury, property damage coverage, sufficient to at least meet your state's limits for financial responsibility. You are responsible for your physical damage coverage and the deductibles. You are also responsible for carrying a valid driver's license and proof that you are carrying the required insurance. You are responsible for all penalties and fines if you are charged for violations while on Company business during assignment with WaMu.

### Information about WaMu's Workplace_____

**CODE OF CONDUCT / ETHICAL STANDARDS:** WaMu expects all personnel, both employees and contract staff, to uphold the highest ethical standards at all times. Our *Vendor Code of Conduct* articulates these standards as they apply to our contract staff. You or your employer has received a copy of the *Code of Conduct* as part of the agreement under which you are performing services for WaMu, and you are responsible for complying with it at all times while performing services for WaMu. The Vendor Code of Conduct is also available on the Company intranet at
http://collab.wamu.net/sites/005ALegal/Contracts/default.aspx.
**APPROPRIATE WORKPLACE CONDUCT:** WaMu expects all personnel, both employees and contract staff, to treat each other with respect and dignity. The WaMu Appropriate Workplace Conduct policy embodies these standards. All employees and contractors are expected to comply with the version of the policy applicable to their state, and to bring any concerns or violations to the attention of management. A copy of the applicable version is available upon request or through your employer.   If you become an authorized user of the Company intranet, the policy may also be found through the Company Policies page at *http://next.wamu.net/Company%20Policies/default.aspx.*

[The following section appears as faint/illegible text with checkboxes and signature fields]

☐ I have read, understand, and agree to abide by the policies described above, including those regarding Security / Confidentiality.

☐ I understand that Company property (I understand that violation of any of these conditions could result in the termination of my contract and that unauthorized use or disclosure of Confidential Information or Company Property would cause irreparable harm to the Company, entitling the Company to all available equitable remedies, including injunctive relief.

☐ I understand that the above conditions supplement, and do not limit or override, any provisions stated in my separate contract agreement, to the extent that WaMu and I meet the company or firm that employs me, and limitations of liability in the Agreement under which I am providing services to WaMu apply to my services.

☐ I understand that I am expected to review and comply with WaMu's Vendor Code of Conduct.

☐ I understand that I am expected to review and comply with the Appropriate Workplace Conduct policy.

CONTRACTED STAFF MEMBER'S SIGNATURE    PRINTED NAME LAST        FOUR NUMBERS OF SSN  DATE

A WaMu Manager must sign below and submit this form to Information Security at mailstop XXXXX. By signing this document, you are verifying that the contract staff or contractor named above:

☐ Requires OR ☐ Does NOT Require (Check one) the ability to access WaMu's computer systems including Washington Mutual Confidential Information and

☐ Has been provided a copy of the Vendor Code of Conduct and the Appropriate Workplace Conduct policy.

AUTHORIZING MANAGER'S SIGNATURE    |    PRINTED NAME    |    DATE

# EXHIBIT B

Document2



**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201

Division of Resolutions and Receiverships

July 8, 2009

USPS CERTIFIED MAIL
RETURN RECEIPT REQUESTED
RECEIPT NO. 7008 1140 0002 4117 7542

Compliance Coach Inc.
Attn: Pam Perdue, Vice President
4370 La Jolla Village Dr., Suite 400
*San Diego, CA 92122*

SUBJECT:    FIN #10015
            Washington Mutual Bank, Henderson, NV
            In Receivership
            Closing Date: September 25, 2008
            Official Bar Date: December 30, 2008
            Effective Repudiation Date: July 8, 2009
            <u>Contract or Agreement with Compliance Coach Inc and Washington Mutual Bank</u>
            <u>concerning Web Services Agreement dated 7-1-2008  #C1201081</u>

Dear Sir or Madam:

      The above-captioned depository institution (the "Institution") was closed on the *Closing* Date referenced above and the Federal Deposit Insurance Corporation was appointed as Receiver of the Institution (the "Receiver"). Under the laws of the United States, the Receiver is charged with the duty of winding up the affairs of the Institution. In order to achieve this goal, the Receiver is given the right under 12 U.S.C. Section 1821(e) to disaffirm undertakings entered into by the Institution where it finds such undertakings to be burdensome and where such disaffirmance will promote the orderly administration of the Institution's affairs.

      The Institution's records indicate that you may be a party to the above-referenced contract. The Receiver has determined that the above-referenced contract is burdensome and that disaffirmance of said contract will promote the orderly administration of the institution's affairs. The purpose of this letter is to inform you that the Receiver has elected to disaffirm the above referenced contract to the full extent, if any, that it represents an enforceable obligation of the Institution or the Receiver. This disaffirmance does not apply to any other parties to the contracts.

      Repudiation of service contracts are governed by U.S.C. Section 1821 (e)(7). Claims for damages are limited pursuant to 12 U.S.C. Section 1821(e)(3) to actual direct compensatory damages determined as of the Closing Date. "Actual direct compensatory damages" does <u>not</u>

include punitive or exemplary damages; damages for lost profits or opportunity; or damages for pain and suffering.

You may file a claim by documenting the circumstances and submitting your claim in writing to the following address:

Federal Deposit Insurance Corporation
Receiver: Washington Mutual Bank
Attention: Claims Department, DRR
40 Pacifica
Irvine, CA. 92618

    If you wish to file a claim with the Receiver, you must do so in writing within 90 days from the date of this letter or the official "Bar Date," whichever is later.  Under federal law, with certain limited exceptions, failure to file claims by the Bar Date or within 90 days of the date of the repudiation letter will result in disallowance by the Receiver.  The disallowance will be final and further rights or remedies with regard to claims will be barred.

    If you have any questions concerning any of the matters discussed above, you may contact the Claims Agent In Charge for Washington Mutual Bank at the address provided.

                Federal Deposit Insurance Corporation, as
                Receiver of Washington Mutual Bank

                *Robert C. Schoppe/mB*

                Robert C. Schoppe
                Receiver-in-Charge

# EXHIBIT C



**Procopio**, Cory, Hargreaves & Savitch LLP

Jeffrey Isaacs
Direct Dial: (619) 515-3212
E-mail: ji@procopio.com

July 21, 2009

## CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Federal Deposit Insurance Corporation
Receiver: Washington Mutual Bank
Attn: Claims Department
40 Pacifica
Irvine, California 92618

> Re:   **FIN #10015**
> **Washington Mutual Bank, Henderson, NV**
> **In Receivership**
> **Closing Date: September 25, 2008**
> **Official Bar Date: December 30, 2008**
> **Effective Repudiation Date: July 8, 2009**
> **Contract or Agreement with Compliance Coach Inc. and Washington**
> **Mutual Bank concerning Web Services Agreement dated 7/1/08 #C1201081**

Dear Sir or Madam:

This office represents Compliance Coach Inc. ("Compliance Coach"). Your letter of July 8, 2009 to Compliance Coach regarding the above matter has been referred to my attention.

In your letter of July 8, 2009, you provided notice of a bar date for the filing of claims with the receiver of Washington Mutual Bank (the "Bank"). This letter is intended to constitute Compliance Coach's claim (the "Claim") pursuant to that letter. The Claim is based on the following facts:

> a.  Compliance Coach was and now is a corporation existing under the virtue of the laws of the State of California;
>
> b.  The primary business of Compliance Coach is to provide computer software to assist in the standardized training of employees and agents of large businesses in order to facilitate such businesses' compliance with applicable law;
>
> c.  Effective July 1, 2008, a written agreement entitled "Webservice Agreement" (the "Agreement") was entered into between Compliance Coach, on the one hand, and

Federal Deposit Insurance Corporation
July 21, 2009
Page 2

the Bank, including its affiliates and direct and indirect subsidiaries (collectively "WaMu"). A true and correct copy of the Agreement is attached hereto as Exhibit 1;

d. The Agreement was executed by Beverly Carey, a Senior Vice President of the Bank, on July 17, 2008, in Seattle, Washington and by Sai Huda as Chief Executive Officer of Compliance Coach, on July 21, 2008, in San Diego, California;

e. Between July 21, 2008 and October 15, 2008, Compliance Coach performed its obligations under the Agreement by electronically delivering to WaMu in San Diego the software which is the subject of the Agreement. WaMu personnel subsequently confirmed that the software was deployed, however, to date, WaMu has paid only $65,000 of the total agreed price of $260,000, leaving an unpaid balance of $195,000. Accordingly, the Claim is in the sum of $195,000;

f. Section 3.2 of the Agreement pertaining to post-termination matters provides that from and after termination, all sums owed to Compliance Coach by WaMu shall become immediately due and payable. By reason of the termination of the Agreement, the entirety of the Claim of $195,000 is fully due and payable; and

g. No part of the Claim is comprised of or includes punitive or exemplary damages, damages for lost profits or opportunity; or damages for pain and suffering.

If you have any questions or if you require further information to support the Claim, please contact the undersigned.

Sincerely,

Jeffrey Isaacs

JI:sps
Enclosure
cc:    Mr. Sai Huda

113845/000000/1075768.01

# Web Services Agreement

This Agreement is made on this first day of July, 2008 ("Effective Date") by and between **Compliance Coach, Inc.** ("Compliance Coach") and **Washington Mutual Bank**, a federal savings association, including its affiliates and direct and indirect subsidiaries (collectively, "WaMu"). Each of WaMu and Compliance Coach may be individually referred to as a "Party" and together as the "Parties."

## RECITALS

A.     Compliance Coach is engaged in the development, licensing and distribution of certain web-based compliance training services (collectively, the "Web Services"), as more fully described in Schedule A (The Web Services), and Compliance Coach has extensive experience providing such services to large organizations; and

B.     WaMu desires to license from Compliance Coach access to the Web Services.

NOW, THEREFORE, in consideration of the promises contained in this Agreement, the Parties hereby agree as follows:

**1.0     DEFINITIONS**

"Agreement" means this Web Services Agreement and all attached schedules and exhibits.

"Proprietary or Confidential Information" shall mean, with respect to a Party hereto, all information or material which (i) gives that Party some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of that Party; or (ii) which is either (A) marked "Confidential," "Restricted," or "Proprietary Information" or other similar marking, (B) known by the Parties to be considered confidential and proprietary or (C) from all the relevant circumstances should reasonably be assumed to be confidential and proprietary. Compliance Coach's Proprietary or Confidential Information shall remain the sole and exclusive property of Compliance Coach. WaMu's Proprietary or Confidential Information shall remain the sole and exclusive property of WaMu. Neither Party shall have any obligation with respect to confidential information which: (i) is or becomes generally known to the public by any means other than a breach of the obligations of a receiving Party; (ii) was previously known to the receiving Party or rightly received by the receiving Party from a third Party; (iii) is independently developed by the receiving Party; or (iv) subject to disclosure under court order or other lawful process.

"Documentation" means such written materials describing the Web Services as are provided by Compliance Coach to WaMu under this Agreement.

"Intellectual Property" means all inventions, works of authorship, information fixed in any tangible medium of expression, moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas, and all other subject matter protectable under patent, copyright, moral right, mask work, trademarks, trade secret, or other laws, including without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, artwork, software, programming, applets, scripts, and designs.

"Web Services" means the Internet related services to be provided by Compliance Coach to WaMu, as more particularly described in Schedule A.

"Users" means WaMu employees who will access the Web Services. At no time shall WaMu permit unauthorized Users to access the Web Services. The maximum number of authorized Users shall be as indicated in Schedule A (Users).

"Deliverables" means all data, materials, work product and deliverables to be developed or delivered by Compliance Coach in connection with the Services hereunder as set forth in an applicable Statement of Work (defined below).

"Statement of Work" or "SOW": The mutually agreed to plan and delineation of activities, events and Services to be performed, and Deliverables to be provided, by Company under this Agreement, which may be evidenced by one or more SOWs. Each SOW shall include a detailed schedule for performance of the Services and delivery of the Deliverables and the costs associated with the Services and Deliverables and will be substantially in the form of the Statement of Work attached hereto as Schedule A (Statement of Work). Each executed SOW shall be attached hereto and incorporated herein, and the terms and conditions of this Agreement shall apply to each SOW as sequentially numbered SOW 1, SOW 2, et seq.

**2.0    SCOPE AND LICENSE**

2.1    License Grant and Restrictions. Subject to the terms and conditions of this Agreement, Compliance Coach grants WaMu, during the term of this Agreement a non-transferable, non-exclusive license for authorized Users to access the Web Services. In addition to the other provisions of this Agreement, the license granted in this Section is subject to the following conditions:

(a)    WaMu shall not exceed the maximum number of authorized Users identified in Schedule A;
(b)    WaMu shall not copy, translate, port, modify, or make derivative works of the Web Services;
(c)    WaMu shall not derive or attempt to derive the source code, source files, or structure of all or any portion of the Web Services by reverse engineering, disassembly, decompilation, or any other means. WaMu shall have no right whatsoever to receive, review, or otherwise use or have access to the source or object code for the Web Services;
(d)    All domain names, and associated rights of Compliance Coach shall remain the property of Compliance Coach;
(e)    Compliance Coach, at no additional charge to WaMu, shall provide WaMu with such documentation made available by Compliance Coach for use of the Web Services. WaMu may copy or modify the documentation or produce its own materials for internal use only.

2.2    Intellectual Property Protection. The Web Services contain material that is protected by United States copyright law and trade secret law. All rights not expressly granted to WaMu under this Agreement are expressly reserved by Compliance Coach.

2.3    Ownership. All Intellectual Property rights in the Web Services are and shall remain the sole and exclusive property of Compliance Coach. To the extent Compliance Coach has licensed certain components of the Web Services from third Parties, all rights to those components are reserved by such third Parties.

2.4    Use of Trademarks/Trade Names. Except as provided herein, neither Party shall use the company trademarks or trade names of the other Party without the other Party's prior written consent. Neither Party shall use the other Party's name or mark in any advertising, written sales promotion, press releases and/or other publicity matters relating to this Agreement without the other Party's written consent. Compliance Coach acknowledges that WaMu has a no publicity policy regarding its vendor relationships. Notwithstanding the above, during the Term of this Agreement only, Compliance Coach may list WaMu's name, but not the WaMu logo, on a customer list that it provides to prospective buyers of its products or services.

2.5    WaMu Support. Support services, if any, to be provided by Compliance Coach to WaMu shall be identified in Schedule A (The Web Services).

2.6    Services. Compliance Coach shall perform the Services according to the terms and conditions set forth in this Agreement and the applicable Statement of Work. Schedule A includes a description of the scope of services to be performed (which may be referred to as a "scope of services"), and additional Schedules may be added, each of which describes a particular project or set of services to be performed. No Statement of Work shall be effective until signed by authorized representatives from both Parties. Compliance Coach shall comply, and shall cause its personnel, agents and any authorized subcontractor(s) providing Services to comply, with applicable WaMu rules, regulations and policies, including the "Vendor Code of Conduct" attached hereto as Schedule B (Vendor Code of Conduct). If Compliance Coach provides any Services at a WaMu facility, then Compliance Coach shall additionally require such personnel, agents and authorized subcontractor(s) to execute and comply with WaMu's "Working With WaMu" terms, attached hereto as Schedule C (Working with WaMu). Except as otherwise specifically authorized by WaMu in writing in advance, all Services shall be provided to and from locations within the United States. If there are ancillary services, functions, responsibilities or tasks not specifically described in a Schedule that are required for the proper performance and provision of the Services under such Schedule or that are an inherent part of, or a necessary subpart included within such Services, then such services, functions, responsibilities or tasks shall be deemed to be implied by and included within the scope of the Schedule to the same extent and in the same manner as if specifically described in such Schedule.

2.7    Subcontracting. Compliance Coach may not subcontract any Services without the prior written consent of WaMu. Compliance Coach shall remain responsible and liable for any subcontractor's and agent's compliance with this Agreement and performance hereunder. WaMu may require Compliance Coach to remove or replace any subcontractor(s) or agent(s) whose performance is deemed unacceptable to WaMu. In no event shall WaMu pay more for subcontracted Services than WaMu pays for Compliance Coach's Services hereunder (e.g., in the case of Services compensated on an hourly basis, time and materials rates for subcontractors shall be the same or less than time and materials rates for Compliance Coach). Compliance Coach shall ensure that all its subcontractors and agents who provide Services under this Agreement are made aware of the terms and conditions of this Agreement.

2.8    Code Audit.  At WaMu's request, Compliance Coach shall at its expense conduct an audit of the Deliverables to identify any free and open source software code that may be present in the Deliverables and shall provide the results of the audit to WaMu.  Compliance Coach is also encouraged to voluntarily conduct such a code audit periodically at its own expense and provide the results of such audit to WaMu.  At no additional cost or expense to WaMu, Compliance Coach shall, and shall use reasonable efforts to cause its employees and agents to, cooperate with WaMu in any investigation that may be required to determine the origin of any code used in any Deliverable(s).

## 3.0    TERM AND TERMINATION

3.1    Term.  This Agreement shall commence on the Effective Date and shall continue in force for two (2) years , unless earlier terminated as provided herein.  Subject to the payment of applicable license fees, the Agreement shall be automatically renewed for successive one (1) year terms unless either Party, in its discretion, notifies the other Party in writing to the contrary within at least thirty (30) days prior to the expiration of the current term.  The initial term and any renewal terms shall be referred to herein as the "term" or "Term."  Notwithstanding the above, this Agreement shall automatically terminate if for any reason(s) Compliance Coach ceases to have the rights to distribute the Web Services.

3.2    Termination.  Notwithstanding the foregoing, this Agreement shall terminate:

(a)    On the thirtieth (30th) day after either Party gives the other written notice of a breach by the other of any material term or condition of this Agreement, unless the breach is cured before that day.  If Compliance Coach breaches a material term of this agreement and fails to remedy said breach within thirty (30) days, WaMu shall be entitled to a prorated refund of any and all fees paid to Compliance Coach for the current Term and to cancel any subsequent Term.  If WaMu breaches a material term of this agreement, Compliance Coach shall be entitled to suspend the remainder of any remaining Term of the agreement and to retain any and all fees that have been paid or are payable to Compliance Coach; or

(b)    Upon written notice by either Party, immediately, if (i) a receiver is appointed for the other Party or its property; (ii) the other Party becomes insolvent or unable to pay its debts as they mature in the ordinary course of business or makes a general assignment for the benefit of its creditors; or (iii) any proceedings (whether voluntary or involuntary) are commenced against the other Party under any bankruptcy or similar law and such proceedings are not vacated or set aside within sixty (60) days from the date of commencement thereof.

(c)    This Agreement and/or any Exhibit may be terminated immediately, in whole or in part, by WaMu for its convenience at any time, by WaMu giving Compliance Coach thirty (30) calendar days' notice.  In the case of such termination for convenience, all remaining license fees for the Agreement Term owed to Compliance Coach shall become immediately due and payable.

3.3    Post Termination.  From and after termination:

(a)    All sums owed to Compliance Coach by WaMu shall become immediately due and payable upon the effective date of termination;

(b)    All licenses granted hereunder shall terminate;

(c)    Each Party shall immediately cease use of all Proprietary or Confidential Information belonging to the other Party and shall irretrievably delete and/or remove such items from all computer hardware and storage media, including backups.

## 4.0    COMPENSATION

a.    Fees.  Subject to Compliance Coach's performance of the Services hereunder, WaMu shall compensate Compliance Coach as set forth in the applicable Schedule.  These fees shall be Compliance Coach's only compensation for Services.  Compliance Coach shall not proceed with or be reimbursed for any Services that: (i) have not been authorized in advance by a WaMu Representative in connection with an applicable SOW; and/or (ii) exceed any budget or expenditure limit set forth in an applicable SOW.

b.    Invoices.  Compliance Coach shall invoice WaMu on a quarterly basis for Services in accordance with the milestone schedule (if any) set forth in the applicable Schedule.  Compliance Coach shall submit invoices to the address and WaMu Representative set forth in the applicable Schedule, unless Compliance Coach is established as a vendor on WaMu's eProcurement system, in which case Compliance Coach shall follow WaMu's policies with respect to submission of electronic invoices.  All invoices must include a detailed statement of the Services and/or Deliverables covered by such invoice, and reference this Agreement, the applicable Schedule number, and the purchase order number (if any) set forth in the applicable Schedule.  WaMu shall pay Compliance Coach all undisputed portions of correct and complete invoices for Services that meet Specifications within fifteen (15) days

after receipt of the invoice or in accordance with any payment schedule set forth in the applicable Schedule. Compliance Coach shall be deemed to have waived all charges, fees and approved expenses that are not invoiced within ninety (90) days after the end of the calendar year in which the charges were incurred.

c.  Expenses. Out-of-town travel expenses that are pre-approved in writing and are reasonable and necessary shall be reimbursed at actual cost without markup. In no event shall WaMu pay for travel time. Airfares must be at coach rates, although Compliance Coach may choose to upgrade at its own expense. Where practical, airfares shall be booked at least seven (7) days in advance. Daily meal allowance is $35 per day ($50 per day in New York and Illinois) per Compliance Coach personnel providing Services hereunder. Ground transportation shall be reimbursed at actual cost, not to exceed $40 per Compliance Coach personnel per day. Unless otherwise agreed in writing, hotels shall be reserved using WaMu's designated hotels where discounts have been negotiated.

d.  Taxes. WaMu is responsible for all applicable taxes, duties or other charges, including sales or use taxes, imposed by any federal, state or local governmental entity on Services furnished by Compliance Coach under this Agreement, except for taxes based on Compliance Coach's net income, gross revenue or employment obligations. If Compliance Coach is obligated by applicable law or regulation to collect and remit any taxes relating to the Services (except for taxes based on employment obligations), then Compliance Coach shall add the appropriate amount to WaMu's invoices as a separate line item. Compliance Coach shall indemnify, defend and hold WaMu harmless from and against any interest, penalties or other charges resulting from the non-payment or late payment of taxes or other charges for which Compliance Coach failed to invoice WaMu or which Compliance Coach otherwise failed to pay in a timely manner.

**5.0    CONFIDENTIALITY AND CONSUMER PRIVACY**

a.  Definition. "Confidential Information" of a Party means all confidential or proprietary information, including all information not generally known to the public, the terms of this Agreement and WaMu Data. "WaMu Data" shall mean all data and information that is submitted, directly or indirectly, to Compliance Coach by WaMu or obtained or learned by Compliance Coach in connection with the Services provided by Compliance Coach under this Agreement and any Schedule, including information relating to WaMu's customers, technology, operations, facilities, consumer markets, products, capacities, systems, procedures, security practices, research, development, business affairs, ideas, concepts, innovations, inventions, designs, business methodologies, improvements, trade secrets, copyrightable subject matter and other proprietary information. All WaMu Data is and shall remain the property of WaMu and shall be protected as described in this Section 5. Without limiting the foregoing, Confidential Information shall include all such information provided to each Party by the other Party both before and after the date of this Agreement.

b.  Use and Disclosure. All Confidential Information relating to a Party shall be held in confidence by the other Party to the same extent and with at least the same degree of care as such Party protects its own confidential or proprietary information of like kind and import, but in no event using less than a reasonable degree of care. Neither Party shall disclose, duplicate, publish, release, transfer or otherwise make available Confidential Information of the other Party in any form to, or for the use or benefit of, any person or entity without the other Party's prior written consent. Each Party shall, however, be permitted to disclose relevant aspects of the other Party's Confidential Information to its officers, agents, subcontractors, employees and servants to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations under this Agreement and such disclosure is not prohibited by the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. §6801, et seq.), as it may be amended from time to time (the "GLB Act"), the regulations promulgated thereunder or other applicable law. Each Party shall establish commercially reasonable controls to ensure the confidentiality of the Confidential Information and to ensure that the Confidential Information is not disclosed contrary to the provisions of this Agreement, the GLB Act or any other applicable privacy laws and regulations. Without limiting the foregoing, each Party shall, at a minimum, implement such physical and other security measures as are necessary to: (i) ensure the security and confidentiality of the Confidential Information; (ii) protect against any threats or hazards to the security and integrity of the Confidential Information; and (iii) protect against any unauthorized access to or use of the Confidential Information. If applicable, Compliance Coach shall also comply with the Information Security Requirements of WaMu, attached as Schedule D to this Agreement. To the extent Compliance Coach receives or obtains nonpublic personal information (as defined in the GLB Act) of WaMu's customers, Compliance Coach shall, at a minimum, establish and maintain such data security program as is necessary to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information as set forth in the Code of Federal Regulations at 12 C.F.R. Parts 30, 208, 211, 225, 263, 308, 364, 568 and 570. To the extent that a Party hereto delegates any duties and responsibilities under this Agreement to an agent or other subcontractor in accordance with the terms hereof, such Party ensures that such agents and subcontractors shall adhere to the same requirements with which such Party is required to comply under this Agreement.

c.  Exceptions.  The obligations in Section 5 (b) above shall not restrict any disclosure by either Party (a) pursuant to any applicable law, or by order of any court or government agency (provided that the disclosing Party shall give prompt notice to the non-disclosing Party of such order and shall cooperate at the disclosing Party's expense in any effort to comply with or to contest the order); or (b) to either Party's accountants, legal advisors, auditors and financial advisors.  Further, the obligations in Section 5 (b) above shall not apply with respect to information that: (i) is developed by the other Party without violating the disclosing Party's proprietary rights; (ii) is or becomes publicly known (other than through unauthorized disclosure); (iii) is disclosed to, or learned by, the recipient from a third Party free of any obligation of confidentiality; and/or (iv) is already known by such Party without an obligation of confidentiality other than pursuant to this Agreement or any confidentiality agreements entered into before the Effective Date between WaMu and Compliance Coach.  If the GLB Act, the regulations promulgated thereunder or other applicable law now or hereafter in effect imposes a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Section 5.

d.  Disclosure of Confidential Information.  In the event of a breach of this Section 5 or other compromise of WaMu Confidential Information of which Compliance Coach is or should be aware (whether or not resulting from a breach), Compliance Coach shall immediately notify WaMu in a writing detailing all information known to Compliance Coach about the compromise, the WaMu Confidential Information affected, and the steps taken by Compliance Coach to prevent the recurrence of such breach and to mitigate the risk to WaMu.  Such notice shall be sent to the address indicated in the Notice section of this Agreement, including a copy to the Chief Legal Officer as identified therein.  If and to the extent that any compromised WaMu Confidential Information includes any customer data, Compliance Coach shall also identify the customers and customer information affected.  Compliance Coach shall provide WaMu with access to all information related to the security breach as reasonably requested by WaMu.

e.  Return of Materials.  Upon request and/or upon termination of this Agreement for any reason, Compliance Coach shall return, destroy or cause the destruction of, any and all records or copies of records relating to WaMu or its business, including Confidential Information of WaMu (except for Confidential Information of WaMu that is rightfully contained in Compliance Coach's work papers, provided that Compliance Coach maintains the confidentiality of such Confidential Information as required herein) according to WaMu's instructions or relevant industry best practices if no instructions are provided.  Upon request, Compliance Coach shall certify in writing that all such Confidential Information has been so returned or destroyed.

f.  Consumer Privacy.  Compliance Coach acknowledges to WaMu that:  (i) WaMu has a privacy policy (available on WaMu's website at www.wamu.com) or successor website) designed to communicate to WaMu's customers and consumers (as defined in the GLB Act) its policies and procedures regarding its use of nonpublic personal information (the "Privacy Policy"); and (ii) Compliance Coach has received, read and understood the terms of the Privacy Policy as of the Effective Date.  Compliance Coach shall be responsible for periodically reviewing the Privacy Policy during the Term of this Agreement.

g.  Language Conflict.  In the event of a conflict between the Information Security Requirements and the provisions of this Section 5, whichever is more stringent, in WaMu's opinion, shall control.

## 6.0  INSURANCE

a)  Coverage Requirements.  During the Term of this Agreement, and for three (3) years thereafter, Compliance Coach shall maintain the following insurance coverages with insurance carriers with an A.M. Best rating of at least A-VII, or such other insurance carriers:  (i) all insurance coverages required by federal, state or local law, including statutory worker's compensation insurance and employers' liability insurance (and such employers' liability insurance shall provide a limit of at least $500,000 for each person); (ii) comprehensive or commercial general liability insurance (which shall provide for a minimum combined bodily injury and property damage coverage limits of $2,000,000 per occurrence and shall name WaMu as an "additional insured"); (iii) comprehensive automobile liability covering all vehicles that Compliance Coach owns, hires or leases in an amount not less than $1,000,000 (and naming WaMu as an "additional insured"); (iv) a comprehensive crime policy with a limit of $2,000,000 that shall include Fidelity Bond/Employee Crime, employee dishonesty and fidelity coverage for all Compliance Coach employees, officers and agents, computer system fraud, and "on-premises" loss (loss inside the premises) and "in-transit" loss (loss outside the premises).

b)  Additional Requirements.  Within fifteen (15) days after WaMu's request, Compliance Coach shall provide WaMu with a complete copy of any policy (including declaration page) required by this Agreement.

**7.0    LIMITED WARRANTIES**

7.1    Performance Warranty.  Compliance Coach warrants that the Web Services shall perform in all material respects with the documentation for such Web Services.

7.2    Exclusive Remedy.  Except as provided under subparagraph (a) of the Termination section, the exclusive remedy of WaMu against Compliance Coach for breach of the warranties provided in this Section shall be to seek repair or replacement of the affected Web Services. Compliance Coach shall, at no additional cost to WaMu, use commercially reasonable efforts to resolve breaches of the foregoing warranties. The warranties provided in this Section are solely for the benefit of WaMu and WaMu shall have no authority to extend such warranties to any third Party. Compliance Coach shall not be liable for failures caused by WaMu's or any third Party hardware and software, misuse of the Web Services, or the negligence or willful misconduct of WaMu.

7.3    Compliance Coach Representations and Warranties. Compliance Coach represents and warrants to WaMu that:

a)   Compliance Coach is duly organized, validly existing, has full and adequate power to own its property and conduct its business as now conducted, is in good standing and duly licensed, and has procured all necessary licenses, registrations, approvals, consents and any other communications in each jurisdiction as required to enable Compliance Coach to perform its obligations under this Agreement;

b)   The execution, delivery and performance of this Agreement by Compliance Coach and the performance by Compliance Coach of the transactions contemplated in this Agreement have been duly and validly authorized by all necessary action, corporate or otherwise, on its part, and this Agreement and each Schedule constitute the valid, legal and binding obligation of Compliance Coach;

c)   Compliance Coach is not and will not be subject to any agreement or other constraint that does, would, or with the passage of time would, prohibit or restrict Compliance Coach's right or ability to enter into, or carry out, its obligations hereunder;

d)   Compliance Coach has the qualifications and the ability to perform the Services in a professional manner without the advice, control or supervision of WaMu. Compliance Coach shall provide consultants, technicians and/or technical personnel trained to perform the Services in the applicable SOW. All workmanship and, if required, materials or documentation provided by Compliance Coach shall be of the highest quality in every respect and according to the Specifications and any mutually agreed to schedule set forth in the applicable SOW;

e)   Compliance Coach possesses all the legal right, title or interest in or to any intellectual property (such as software, designs, copyrights, patents, trademarks and trade secrets) that have been or shall be used to create or be a part of the Deliverables;

f)    Neither the Services nor the Deliverables, nor any part, product or software sold, distributed, licensed or supplied by Compliance Coach in connection with the Services or Deliverables, do or shall infringe any patent, copyright, trademark or other proprietary right of any third Party or misappropriate any trade secret of any third Party;

g)   Compliance Coach's performance of the Services called for by this Agreement does not and shall not violate any applicable law, rule or regulation;

h)   The Deliverables shall perform according to the Specifications;

i)    To the extent the Deliverables include software, the software, including updates, upgrades and new versions, does not and shall not contain any viruses, malicious code, trojan horse, worm, time bomb, self-help code, back door or other software code or routine designed to: (i) damage, destroy or alter any software or hardware; (ii) reveal, damage, destroy or alter any data; (iii) disable any computer program automatically; or (iv) permit unauthorized access to any software or hardware;

j)    Time is of the essence in connection with Compliance Coach's performance of the Services and delivery of the Deliverables;

k)   Any software provided as part of the Deliverables or the Services contains no third-Party software or any software that may be considered "Free and Open Source Software" or "FOSS," where "FOSS" means any software that users are allowed to run, study, copy, modify and redistribute without restriction, and for which access to source code is a prerequisite to its use, and for which users may or may not be required to pay a fee to use the software;

l)    Except for restrictions on trade with countries against which the United States government has imposed a general embargo, there is no restriction on the export of any of the Deliverables or any software contained therein; and

m)  With respect to WaMu Confidential Information that Compliance Coach has in its possession, Compliance Coach shall maintain, at a minimum, reasonable and customary security measures applicable to the manner in which Compliance Coach possesses such information (e.g., physically, electronically or otherwise) to protect the WaMu Confidential Information from disclosure or breach.

n)  Compliance Coach has revealed all financial interests related to any hardware, software or services or provider thereof that Compliance Coach might recommend to WaMu.

## 8.0    EXCLUSION OF WARRANTIES

EXCEPT AS PROVIDED IN THE LIMITED WARRANTIES SECTION, THE WEB SERVICES ARE PROVIDED TO WAMU "AS IS," WITHOUT WARRANTY OF ANY KIND, EXPRESS AND IMPLIED INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR THE PARTICULAR PURPOSE. COMPLIANCE COACH DOES NOT WARRANT THAT THE WEB SERVICES WILL MEET WAMU'S REQUIREMENTS OR THAT THE OPERATION OF THE WEB SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY COMPLIANCE COACH OR COMPLIANCE COACH'S AUTHORIZED REPRESENTATIVES SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THIS WARRANTY.

WAMU ASSUMES FULL RESPONSIBILITY FOR WAMU'S USE OF THE WEB SERVICES AND USE OF THE INTERNET.   COMPLIANCE COACH SHALL NOT HAVE ANY LIABILITY UNDER ANY PROVISION OF THIS AGREEMENT OR OTHERWISE WITH RESPECT TO ANY PERFORMANCE PROBLEM, CLAIM OF INFRINGEMENT OR OTHER MATTER TO THE EXTENT ATTRIBUTABLE TO ANY UNAUTHORIZED OR IMPROPER USE OR MODIFICATION OF THE WEB SERVICES, OR ANY UNAUTHORIZED COMBINATION OF THE WEB SERVICES WITH PRODUCTS AND SERVICES PROVIDED BY THIRD PARTIES.   WAMU ACKNOWLEDGES AND AGREES THAT COMPLIANCE COACH DOES NOT OPERATE OR CONTROL THE INTERNET AND WAMU FURTHER RECOGNIZES THAT IRRESPECTIVE OF COMPLIANCE COACH'S PERFORMANCE: (i) VIRUSES, WORMS, TROJAN HORSES, OR OTHER UNDESIRABLE DATA OR SOFTWARE MAY ADVERSELY AFFECT THE WEB SERVICES; AND (ii) UNAUTHORIZED USERS (e.g., HACKERS) MAY ATTEMPT TO OBTAIN ACCESS TO WAMU'S DATA, WEB-SITES, COMPUTERS, OR NETWORKS.

## 9.0    LIMITATION OF LIABILITY

IN NO EVENT SHALL COMPLIANCE COACH BE LIABLE TO WAMU OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES FOR LOSS OF BUSINESS, LOSS OF PROFITS, LOSS OF GOODWILL OR BUSINESS REPUTATION, BUSINESS INTERRUPTION, LOSS OF DATA, OR LOSS OF BUSINESS INFORMATION) ARISING OUT OF OR CONNECTED IN ANY WAY WITH THIS AGREEMENT, OR FOR ANY CLAIM BY ANY THIRD PARTY, EVEN IF COMPLIANCE COACH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 10.0    FORCE MAJEURE

Except for the payment of money as described in the Payment Obligations Section of this Agreement, neither Party shall be liable for any failure or delay in performance under this Agreement which is due to any event beyond the reasonable control of such Party, including without limitation, fire, explosion, unavailability of utilities or raw materials, Internet delays and failures, telecommunications failures, unavailability of components, labor difficulties, war, riot, act of God, export control regulations, laws, judgments or government instructions.

## 11.0    NOTICES

All notices, demands or consents given under this Agreement shall be in writing and shall be deemed given when delivered by certified, registered mail or by overnight courier to the receiving Party at the address stated in this Agreement or at such other address given by either Party to the other in writing.

## 12.0    OTHER

12.1    Waiver.  No term or provision hereof shall be considered waived by either Party, and no breach excused by either Party, unless such waiver or consent is in writing signed by the Party against whom the waiver is asserted.  No consent by either Party to, or waiver of, a breach by either Party, whether express or implied, shall constitute a consent to, waiver of, or excuse of any other, different, or subsequent breach by either Party.

12.2    Severability.  If any part of this Agreement is found invalid or unenforceable, that part shall be amended to achieve as nearly as possible the same economic effect as the original provisions and the remainder of this Agreement shall remain in full force.

12.3    Assignment.  This Agreement shall not be assigned by either Party without the prior written consent of the other except as follows:
   (a)  Compliance Coach may assign this Agreement provided such assignment (i) is in writing, and (ii) states that the assignee is accepting all obligations of Compliance Coach under this Agreement and agrees to be bound by and discharge the Agreement's terms, conditions, and obligations as if it were the original Party hereto.
   (b)  WaMu may assign this Agreement to a parent or subsidiary corporation, or in the event of an affiliation, merger, acquisition, sale or disposition of substantially all of its assets, provided such assignment (i) is in writing, and (ii) states that the assignee is accepting all obligations of WaMu under this Agreement and agrees to be bound by and to discharge each of the Agreement's terms, conditions, and obligations as if it were the original Party hereto.

12.4    Independent Contractor.  WaMu acknowledges that Compliance Coach is at all times acting as an independent contractor under this Agreement and except as specifically provided herein, not as an agent, employee, or partner of WaMu.  Neither Party has authority, express or implied, to make any obligation or commitment on behalf of the other.

12.5    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supersedes all prior or simultaneous representations, negotiations, and agreements, whether written or oral, and all industry customs or trade practices.  Neither Party has executed this Agreement by reason of or in reliance on any representations which are not fully stated in this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement and intend it to be effective as of the Effective Date.


Compliance Coach, Inc.                        Washington Mutual Bank


By:  _____        By:  _____

Title:  _____CEO_____        Title:  _____SVP_____

Date:  _____7/21/08_____        Date:  _____7/17/2008_____

Address:    4370 La Jolla Village Drive        Address:  Attn: General Counsel
            Suite 400                                    1301 Second Ave.  m/s wmc 3501
            San Diego, CA  92122                         Seattle, WA  98101

<u>Schedule A</u>
<u>Web Services, Users & Fees</u>

1.    **Description of Services**

Compliance Coach will deliver the Web Services to WaMu via Internet access to Regulatory University™ ("www.regulatoryu.com") hosted at a secure, private server exclusively for WaMu's use, for the Agreement Term.

a.    A library of fifteen (15) interactive Web-based regulatory compliance training courses on key regulatory compliance topics, of WaMu's choice as listed in Section 9 of this Schedule to include among others:

- ♦   Anti-Money Laundering (BSA, USA Patriot Act)
- ♦   OFAC
- ♦   Gramm-Leach-Bliley Act (GLBA)
- ♦   Information Security Guidelines
- ♦   FCRA
- ♦   Identity Theft
- ♦   COPPA
- ♦   Mortgage Lending – Purchase Money, Refinance, Subordinate Loans, HELOC courses covering TILA, ECOA, FHA, FCRA, RESPA, FDPA etc.
- ♦   Insurance
- ♦   Investments
- ♦   Deposits (Reg. D; Reg. DD; Reg. CC; Reg. E)
- ♦   Predatory Lending
- ♦   HMDA Reporting
- ♦   Fair Lending
- ♦   Loans to Insiders (Reg. O)

Compliance Coach shall use commercially reasonable methods to ensure the courses are accurate and free of material defects and have the necessary elements to enable WaMu's compliance with applicable regulations.

New Training modules will be available as they are released. WaMu's system will be updated automatically with the additional content at no charge.

Compliance Coach will customize any of the library courses per WaMu's request, as needed, at no additional charge. Additionally, Compliance Coach will provide consulting services at no additional charge to develop a best practices-based curriculum assignment plan for WaMu to deploy courses enterprise-wide based on job functions or roles.

At its option, WaMu may choose <u>50 Customized BSA/AML + Other Compliance Topics Training Courses</u> per the Optional Fee Schedule set forth in Section 9 below.

b.    <u>Learning Management Center</u> –
- ♦   Automated scoring, tracking, and analytical reporting to document an audit trail of regulatory compliance and measure learning performance.
- ♦   Integration with WaMu's internal Learning Management System at no additional charge, should such services be required.
- ♦   Online "Custom Content Manager" to enable WaMu to create customized regulatory compliance training courses on its internal policies and procedures, along with automated Tests to score and document Users' learning. Customization feature also allows WaMu to create Frequently Asked Questions relating to internal policies and procedures.
- ♦   Online learning management tools such as the Survey Wizard, Synchronous Instructor led Easel Tool, Automated Curriculum Assignment System and Secure Repository.

c.    <u>Expert Views</u> - Access to expert opinions via monthly e-mails, up to three per month. Also, archived web-casts on pertinent regulatory issues with key regulatory agencies commenting on recent rulings and interpretations.

d.    <u>Knowledge Vault</u> of frequently asked questions and answers, sanitized to protect client privacy and confidentiality. Currently contains over 500 FAQ's. Also updated periodically.

e.  <u>Regulatory Tools</u> – Library of online Regulatory Resources and Web Site links relating to laws and regulations.  Also, various online tools and checklists that help an institution assess compliance with regulations, create mandated policies, disclosures, etc.


**2.      Legal Disclaimer**

The online regulatory compliance training services provided by Compliance Coach is general information only.  Compliance Coach shall use commercially reasonable efforts to ensure that the information provided is accurate and timely, however the information provided is not legal advice.  If legal advice is required, the services of a competent professional person should be sought.


**3.      Compliance Coach's Support Obligations**

During the Term, Compliance Coach shall provide the following maintenance and support for the Web Services:

a.  Provide a Customer Care Manager to serve as the project manager and to oversee day to day customer support and training roll out.  This professional will also manage the initial orientation and ongoing training of WaMu system administrators.

b.  Provide WaMu 24 x 7 automated e-mail user login support.  Additionally, reasonable telephone and e-mail technical support.  Compliance Coach's e-mail and telephone support is available Monday through Friday, 8 am to 5 pm PST, excepting Federal legal holidays.  The Parties shall collectively review support usage at least twice each year.

c.  Compliance Coach shall not be responsible for providing maintenance and support services for items of software and hardware that it does not provide under this Agreement.

d.  Compliance Coach shall ensure proper production and storage of daily backups of WaMu's data stored on Compliance Coach's web site.

e.  Use commercially reasonable efforts to promptly correct reproducible significant programming errors in the Web Services that WaMu has identified, classified, and reported to Compliance Coach.

f.  Compliance Coach shall provide to WaMu notification of any planned outages on the Compliance Coach Website.  When possible, at least ten (10) business day's advance notice of planned outages shall be given to WaMu.  Compliance Coach shall not schedule maintenance during a Business Day (defined for this purpose as the period from 7 a.m. to 7 p.m. PT, Monday through Friday).

g.  Compliance Coach will operate and maintain the Compliance Coach site in a secure environment with system support, appropriate redundancy and periodic backup.  In case of an interruption or failure of any of the Services furnished on the Compliance Coach site, including but not limited to power, back-up power, HVAC, transmission and Internet services, Compliance Coach shall use commercially reasonable efforts to restore service as soon as possible.

h.  In the event that the Services are unavailable due to problems caused by any defect or malfunction within the control of Compliance Coach, resulting in downtime of more than two (2) consecutive hours, upon notice by WaMu of such downtime, Compliance Coach will use best efforts to respond within one (1) hour during a "Business Day" (defined for this purpose as the period from 7 a.m. to 7 p.m. PT, Monday through Friday), and within four (4) hours during the weekend, on a national holiday, or after normal business hours on a Business Day.  Downtime shall not include any network unavailability during Compliance Coach's scheduled maintenance as permitted by this section or issues beyond the reasonable control of Compliance Coach.  If Compliance Coach's downtime exceeds thirty-six (36) consecutive hours at any time, then WaMu in its sole discretion can terminate this Agreement.  In such event, WaMu shall not be obliged to make any payments to Compliance Coach with respect to amounts invoiced after the date of termination, but shall be obliged to pay all amounts invoiced by Compliance Coach for services performed prior to the date of termination.  Compliance Coach agrees to provide WaMu with a refund on a prorated basis of fees prepaid for the Services terminated as a result of such breach of this Section.  Compliance Coach shall periodically provide automatic upgrades, as available to its customers, to improve WaMu online experience or improve functionality.  Compliance Coach shall provide continuous, 24-hour-a-day-and-7-day-per-week monitoring of its Website and use commercially reasonable efforts to promptly remedy any problems and maintain operation of the system within the highest industry standards.

i.  Upon notification of a problem or request, Compliance Coach will identify and classify the problem or question.  Compliance Coach will contact WaMu by voice mail or e-mail and will provide an estimated time to repair or solve the problem or inquiry in accordance with the Response Times set forth below.


    1) Error Response Times:

a) "Error" means a material failure of the Compliance Coach services, which failure is demonstrable in the environment for which the Compliance Coach services were designed and causes it to be inoperable or to operate improperly in the environment for which it was designed and is within Compliance Coach's reasonable control to correct. Failures or problems resulting from WaMu's or its End Users' negligence or improper use of the Compliance Coach services, modifications or damage to the Compliance Coach services by Licensee or its End Users, and use of the Compliance Coach services on hardware not certified by Compliance Coach as compatible, are not considered Errors. Error shall not include defects or failures due to reasons outside of Compliance Coach's reasonable control or within WaMu's or WaMu's third Party learning management system provider's reasonable control.

b) "Error Correction" means a procedure or routine that, when observed in the regular operation of the Compliance Coach services, avoids the practical adverse effect of such nonconformity.

2) Compliance Coach will correct any Error reported by WaMu in accordance with the priority level reasonably assigned to such Error by Compliance Coach. The following definitions will apply to such prioritization:
a). "Priority 1 Error" means an Error that renders the Compliance Coach services inoperative or severely impairs the use of the Compliance Coach services.
b). "Priority 2 Error" means an Error that degrades the performance of or restricts use of the Compliance Coach services or an important feature of the Compliance Coach services.
c). "Priority 3 Error" means an Error that causes only a minor impact on the use of the Compliance Coach services.

3) Response Time:
a). "Priority 1 Error": Response within 4 hours/repair within one business day
b). "Priority 2 Error": Response within 4 hours /repair within two business days
c). "Priority 3 Error": Response within 2 days/repair within five business days
The response will be made by a Compliance Coach representative with the skill set sufficient to resolve the problem. WaMu will submit to Compliance Coach any data that Compliance Coach may reasonably require to reproduce or assess the Error and the operating conditions under which the Error occurred. Compliance Coach will provide a written communication to WaMu, via e-mail, confirming the resolution within a commercially reasonable time.

4.    **Systems Development & Maintenance**
a.    Compliance Coach represents and warrants that it has developed and engineered its software without any undocumented application code that bypasses any security features. If there are such accesses, Compliance Coach agrees that it will identify those accesses to WaMu and will remove them without charge to WaMu. If Compliance Coach is using licensed software from another service provider, Compliance Coach agrees to obtain the same written representation and warranty from that third Party software service provider.

b.    Compliance Coach agrees there will be no extraneous access from platforms or use of protocols other than those in the current configuration presented to WaMu by Compliance Coach.

c.    Compliance Coach agrees to maintain all relevant application and system logs and that Compliance Coach will copies of any pertinent logs to help diagnose and resolve any incidents.

5.    **Telecommunication & Network Security**
a.    Both parties shall implement commercially reasonable security measures at each other's respective ends of the connection to protect against unauthorized traffic to pass into the other parties networks through the common Internet connection. WaMu reserves the right to disconnect the Compliance Coach service if unauthorized access is discovered. This does not, however, relieve Compliance Coach of its commitment to perform under the Agreement to which this Schedule is attached. Such performance will continue by Compliance Coach's providing either on-site servicing or a WaMu-acceptable workaround until the inappropriate access can be investigated and resolved to the satisfaction of WaMu. Compliance Coach agrees that any server access required by the Compliance Coach staff through outside security products will be in a READ only mode unless there has been prior, written approval of a security plan for more intrusive access.

6.    **Disaster Recovery and Business Continuity**
Compliance Coach agrees to provide WaMu with documentation of its disaster recovery strategy and/or capability. This description will address actions to be taken in the event of an extended outage of service. (Such an outage could be caused by a number of events ranging from technical hardware/software/network related malfunctions to a catastrophic disaster.) The description shall address:
- Risk avoidance and disaster prevention provisions in place (e.g. physical security systems, fire protection / suppression systems, equipment spare parts on-site, Uninterrupted Power Supply (UPS) and backup generators, etc.).
- Recovery time frames
- Data backup and off-site storage process.
- Lost WaMu Data / data in progress recovery.
- Service recovery strategy

- Notification process
- Recovery testing processes
- Recovery Plan maintenance
- Define recovery roles and responsibilities assumed by Compliance Coach and WaMu.

**7.    Monthly Usage Report**

On or before the fifteenth (15th) day of each calendar month, Compliance Coach may be required by WaMu to provide access to a Monthly Usage Report covering Service usage by Authorized Users during the preceding calendar month ("Reporting Period"). This Report will not be required if the SCORM method of deployment is selected by WaMu. The Monthly Usage Report will be delivered to a representative of WaMu designated in writing by WaMu. WaMu may, in its discretion, change the designated recipient(s) of the Monthly Usage Report from time to time. From time to time, WaMu's reporting requirements may change. Compliance Coach will accommodate WaMu's reasonable requests for additional reporting during the Term. WaMu agrees and understands that they may, at their option, access the monthly usage reporting information set forth above by using the self reporting tool provided to them as part of the Services. The Monthly Usage Report will include the following minimum content:

a.    Total number of Authorized Users accessing each of the customized courses as of the last day of the Reporting Period;
b.    Total number of Authorized Users who have completed each of the customized courses during the Reporting Period;
c.    Total time each Authorized User spent accessing each of the customized courses during the Report Period;

**8.    Users**

During the term of the Web Services Agreement, WaMu shall have access to Regulatory University (www.regulatoryu.com) via the Internet for unlimited authorized WaMu Users.

**9.    Fees**

WaMu shall pay an annual license fee for the Web Services quarterly in advance.  Such fees will be due and payable on the Effective Date of the Web Services Agreement and quarterly thereafter in accordance with the Agreement.  There is only one annual license fee.  There are no other fees (i.e. no course customization, integration, consulting, hosting, course maintenance, course updates or user fees.)

Compliance Coach shall provide WaMu with a fully customized BSA/AML course (each a "Course") for each of the 15 unique lines of business per the table below.

|  |  |  |
|---|---|---|
| • ACH ATM | • Fraud Investigations-Audit Service | • Risk Mitigation |
| • BSA-AML Operations Group | • Home Loans | • Treasury & Capital Markets |
| • Card Services | • Line of Business Groups | • Wire Room |
| • Commercial | • Retail | • WM Insurance Services WMIS |
| • ECC | • Retail Sm. Business Lending | • WM Investments |

For each course, Compliance Coach will cover the topics listed below, as applicable to the job functions in each of the 15 business lines.

| Focus on BSA/AML and USA Patriot | Money Services Businesses | High Risk Persons and Entities |
|---|---|---|
| Money Laundering | Foreign Relations | High Risk Products and Services |
| Red Flags of Money Laundering | Investigator and Analysis Training | High Risk Geographic Locations |
| BSA/AML Compliance Program | Information Sharing | Flood Disaster Protection |
| Currency Transaction Reports (CTRs) | Customer Identification Program (CIP) | Fair Lending Act |
| Suspicious Activity Reports (SARs) | Customer Due Diligence (CDD) | Privacy (GLBA) |
| Monetary Instruments Logs (MILs) | Office of Foreign Assets Control (OFAC) | Nondeposit Investment Products |
| Funds Transfers | OFAC Program | Cayman Island Facility/Products |

Should WaMu prefer to roll out a fewer number of courses, Compliance Coach will identify creative ways to consolidate and reduce the number of courses.  Either way, Compliance Coach has the flexibility and technology resources to meet WaMu's needs and preferences.

Each course will be deployed via SCORM or AICC integration, per WaMu's preference.

Additionally, Compliance Coach will provide complimentary consulting services to assist WaMu with project management, developing a risk-based, best practices-based training strategy and plan, analysis of proposed curriculum to identify any gaps,

review of job functions and mapping to course content, benchmarking, pre and post deployment analysis and measurements and other training deployment services.

**Fee Schedule**

| Term | Content | Price |
|------|---------|-------|
| 24 months | 15 Customized BSA/AML Training Courses | $130,000 annual license fee, payable quarterly |

At its option, WaMu may choose to upgrade, effective September 30, 2008 to the following Fee Schedule.

**Optional Fee Schedule**

| Term | Content | Price |
|------|---------|-------|
| 24 months | 50 Customized BSA/AML + Other Compliance Topics Training Courses | $225,000 annual license fee, payable quarterly |

**Schedule B**
**Vendor Code of Conduct**

**Vendor Code of Conduct**

---

**Owner Name:** Contracts and Regulatory Group
Legal Department

**Effective Date:** 10/19/2004
**Revision Date:** 06/12/2007

---

## INTRODUCTION

WaMu's *Vendor Code of Conduct* (the "*Code*") extends to third party vendors ("Vendors"). WaMu's commitment to conduct its business ethically and responsibly. As used in this *Code*, "WaMu" means Washington Mutual, Inc. and all of its direct and indirect subsidiaries and affiliates. As the context requires, "Vendor" includes a Vendor's respective employees, agents, suppliers, and subcontractors (who may also be referred to collectively as "Personnel"). The *Code* applies to all Vendors, regardless of which WaMu entity has engaged them. In the event of a direct conflict between this *Code* and Vendor's engagement contract with WaMu (the "Engagement Contract"), the provisions of the Engagement Contract on the matter in conflict shall govern. WaMu requires all Vendors and their Personnel to adhere to the letter and spirit of the *Code* at all times while they are performing services or otherwise transacting business with or on behalf of WaMu, regardless of whether their business activities occur at a WaMu workplace or elsewhere. The *Code* provides general guidance on issues that concern WaMu, but because the *Code* cannot and does not anticipate every ethical dilemma that might arise in connection with a Vendor's engagement, Vendors and their Personnel are expected to use common sense, good judgment, individual character, and integrity to determine proper conduct for issues not specifically addressed in the *Code* or in the body of the Vendor's Engagement Contract.

## BUSINESS PRACTICES

### Conflicts of Interest

WaMu considers a "conflict of interest" to be any situation in which a Vendor's or its Personnel's own interests compete with the business of WaMu or interfere with their obligations to WaMu. In their business dealings with or on behalf of WaMu, Vendor and its Personnel must always avoid actual, potential, or apparent conflicts of interest between Vendor and/or any of its Personnel and WaMu. Without limiting the generality of the foregoing, Vendors and their Personnel (a) shall not deal directly with any WaMu employee who holds, or whose spouse, domestic partner, or other family member or relative holds, a significant financial interest in the Vendor; and (b) shall not, in the course of negotiating the Vendor's Engagement Contract or performing the Vendor's obligations, deal directly with a spouse, domestic partner, or other family member or relative who is employed by WaMu.

The appearance of a conflict of interest can be as damaging to a Vendor and WaMu as an actual conflict. Therefore, it is important that all potential personal or business conflicts of interest be disclosed to a "Senior Manager" in the WaMu business unit that has engaged the Vendor, including those cases in which the Vendor or its Personnel are placed in a conflict of interest inadvertently. For purposes of this *Code*, references to a "Senior Manager" refers to a Senior Vice President or above; provided, however, that if the applicable Senior Manager is himself or herself the party to whom the relevant policy or prohibition under this *Code* applies (e.g., because he or she is being offered an item of value by Vendor, etc.), a Vendor should bring the matter to the attention of such Senior Manager's manager.

**Accepting or Offering Items of Value**

To avoid violation of law, violation of WaMu policy, and the appearance of impropriety, in the course of performing services for, or otherwise conducting business with or on behalf of, WaMu, a Vendor and its Personnel shall not: (a) solicit, encourage, or accept items of value (other than bona fide compensation paid by WaMu) from any WaMu employee or any third parties who are directly or indirectly related to the WaMu business activity in which the Vendor is engaged; or (b) offer items of value to any WaMu officers or employees (other than bona fide compensation, incentives, or credits paid by the Vendor to WaMu pursuant to the terms of the Vendor's Engagement Contract). This prohibition is effective even if the intentions of the person offering the item are innocent.

Notwithstanding the general prohibition above, and except as prohibited by applicable law or regulation (including, without limitation, the Real Estate Settlement Procedures Act) or the Vendor's Engagement Contract, WaMu recognizes the following limited situations in which items of value may be offered by Vendors or their Personnel to WaMu officers or employees, or accepted by Vendors or their Personnel from WaMu personnel or third parties who are directly or indirectly related to the WaMu business activity in which the Vendor is engaged, without actual or perceived risk of corruption or breach of trust:

(1)  The valuable item or benefit is given because of a familial or personal relationship independent of any business of WaMu; or

(2)  The valuable item or benefit is available to the general public under the same conditions upon which it is made available to WaMu employees or the Vendor or its Personnel; or

(3)  The valuable item is the type of promotional item or small gift that companies provide to their customers or business partners in the ordinary course of business (such as flowers accepted in recognition of a wedding, illness, or similar occasion), or the benefit is exchanged as a commonly accepted element of business practice (such as a meal accepted in the course of a bona fide business meeting), provided that this exception is subject to a dollar limitation of $250.00.

In addition, if a Vendor or its Personnel offers or accepts any item valued at greater than $100.00 but less than $250.00 under exception (3) above, the Vendor or its Personnel must promptly report the offer or acceptance of such item to the applicable Senior Manager in the business unit that has engaged the Vendor. Under no circumstances may a Vendor or its Personnel accept travel arrangements or other similar accommodations, or related meals, refreshments, or entertainment, paid for by anyone other than the Vendor or WaMu, where the furnishing of such items is in any way related to, or the result of, the Vendor's association with WaMu. Under no circumstances may a Vendor or its Personnel offer travel arrangements or other similar accommodations, or related meals, refreshments, or entertainment, to any WaMu employee without obtaining advance approval from such WaMu employee's Senior Manager.

In rare instances, circumstances may warrant acceptance by a Vendor or its Personnel of items exchanged as a commonly accepted element of business practice with a value over $250.00, or the offer by a Vendor or its Personnel to WaMu employees of such items. Acceptance by Vendor or its Personnel of such items in these circumstances requires the prior approval of a Senior Manager in the business unit that has engaged the Vendor. Prior to offering such items to a WaMu employee, Vendor or its Personnel shall obtain the approval of the WaMu employee's Senior Manager. If in connection with a Vendor's engagement for WaMu, the Vendor or its Personnel is/are offered any valuable item by a current or potential WaMu customer or vendor or if Vendor or its Personnel offers any valuable item to a WaMu employee under circumstances that do not fall within exceptions (1), (2), or (3) above, the nature and

2

estimated value of the item must be reported immediately upon receipt as follows:  (a) for items offered to Vendor or its Personnel, to the applicable Senior Manager in the business unit that has engaged the Vendor; and (b) for items offered to a WaMu employee, the applicable Senior Manager in the business unit of the WaMu employee.  If it is not possible to report such item immediately upon its receipt, it should be reported within three (3) business days of its receipt.

Cash should never be offered or accepted, regardless of the amount.

### Processing Personal Transactions

Vendors and their Personnel are encouraged to take advantage of WaMu's products and services.  However, Vendor Personnel may not process transactions that create a potential conflict of interest or security risk.

To the extent that any Vendor's engagement for WaMu may involve processing deposit or other banking service transactions, no Vendor Personnel may process their own deposit and/or other banking or credit card transactions, those of an immediate family member, or those of a close friend.  For purposes of this Code, an "immediate family member" is defined as a Personnel's spouse or domestic partner, or either of their parent, son, daughter, sibling, grandchild, grandparent, niece, nephew, aunt, uncle, or a person living in the same household as such persons.  While a Vendor's duties in the course of its engagement may enable its Personnel to have access to view their respective account balances on WaMu computer systems, such Personnel may not reverse fees, transfer funds, place or remove holds, process deposits, transactions, or payments, or perform any other maintenance on their accounts or those of an immediate family member or close friend.

To the extent that any Vendor's engagement for WaMu may involve loan origination or processing or the processing of credit card applications, no Vendor Personnel may take an application for a loan or credit card for themselves, an immediate family member, or a close friend.  Likewise, they may not process or approve such loan or credit card application.  If any Vendor Personnel, their immediate family member, or close friend wishes to take a loan from WaMu or apply for a credit card, they may do so through channels available to the general public.  In addition to the foregoing, no Vendor Personnel may take an application for, process, or approve a real estate loan when they or an immediate family member has an ownership interest in any property that is used as collateral for the loan (regardless of whether the Vendor Personnel or their immediate family member is the seller or buyer of the property).

## PROTECTION AND PROPER USE OF RESOURCES

### WaMu Resources Generally

Vendors and their Personnel are expected to use WaMu's resources only in furtherance of WaMu business and to protect all resources under their control from theft, waste, or other loss.  Proper protection includes, among other things, avoiding actions that are likely to damage or diminish the reputation of WaMu.  Accordingly, neither a Vendor nor its Personnel may use WaMu resources for personal purposes (including in circumstances that may lead others to believe that such use is on behalf of, or endorsed by, WaMu), except where specifically allowed.  Occasional, minimal use may be allowed under certain circumstances, but WaMu may request reimbursement from the Vendor for the direct costs associated with such use.

### WaMu Network and Systems

Vendors and their Personnel must comply with all WaMu security and privacy procedures and access and use policies as a condition of receiving access to WaMu's computer network (including requirements for maintenance of passwords) and to all other systems and buildings.  All data stored or transmitted on equipment owned or leased by WaMu is to be considered

3

private and is the property of WaMu unless the Vendor's Engagement Contract expressly provides otherwise. WaMu may monitor all use of its corporate network and systems (including email) and/or access all data stored or transmitted using its network. WaMu-provided information systems (including email) may be used only for legitimate business-related purposes and in a manner that is otherwise consistent with the other provisions of this *Code*.

### Intellectual Property

Vendors and their Personnel are expected to respect the intellectual property ownership rights of WaMu and all third parties, including, but not limited to, copyrights, trademarks, patents, and trade secrets. Vendors and their Personnel shall use software, hardware, and any content only in accordance with applicable associated licenses or terms of use.

## HONESTY AND FAIR DEALING

### Honesty

WaMu expects Vendors and their Personnel to perform services for and otherwise conduct business with or on behalf of WaMu with absolute honesty and integrity.

### Fair Dealing

WaMu strives to ensure that all of its actions are guided by absolute honesty, integrity, and fairness. WaMu believes that cooperation, trust, and shared objectives are vital to its success. As a result, Vendors and their Personnel are expected to deal fairly with others, including, but not limited to, WaMu's customers, suppliers, competitors, and employees. Vendors and their Personnel may not take unfair advantage of others through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or other unfair business practices.

### Accuracy and Completeness of WaMu Records

Vendors and their Personnel are expected to maintain all WaMu records within their control in a complete and accurate manner. If a Vendor or its Personnel is/are responsible for creation or disposal of business records, they must do so honestly, accurately, and in full compliance with applicable legal and regulatory requirements. Accounts or other corporate records may not be structured so as to avoid reporting or signing authority requirements, nor may a transaction be misrepresented to make it appear more beneficial to WaMu, or anyone else, than it really is. Falsifying or misrepresenting WaMu accounts and records is considered by WaMu to be the equivalent of fraud.

### Theft

WaMu will not tolerate theft by its Vendors, their Personnel, or anyone else. WaMu considers a person to have committed theft if WaMu determines that the person misappropriated property, financial assets, or information belonging to WaMu, its customers, vendors, employees, or visitors. All such thefts must be reported to the appropriate regulatory agency and law enforcement officials, regardless of the dollar amount involved.

### Reporting Illegal or Dishonest Acts

Whenever a Vendor or its Personnel believes that someone working at or for WaMu (whether or not that person is a WaMu employee) has committed an illegal or dishonest act, or an act that causes, or is substantially likely to cause, harm to people or property or has violated a provision of this *Code*, they should report it to a Senior Manager in the business unit that has engaged them or as otherwise described in the "Interpretation of Code and Reporting Possible Violations" section at the end of this *Code*. Information reported will be held in strict confidence to the

4

extent reasonably possible. Anyone who knows of but fails to report an illegal, dishonest, or harmful act or a violation of this *Code* may be considered a participant in the act or violation.

## VENDOR'S EMPLOYMENT PRACTICES

### Non-Discrimination

WaMu values and is committed to maintaining a diverse work environment where everyone can work together comfortably and productively so that new ideas and sound strategies may be implemented with enthusiasm. WaMu strives to create and maintain an environment in which people are valued and appreciated for their contributions. Therefore, WaMu expects all Vendors and their Personnel to treat each other, WaMu employees, and anyone else they come into contact with at a WaMu facility with respect.

WaMu prohibits discrimination against any of its employees, customers, or Vendors and their Personnel, particularly if the conduct is based on an individual's race, religion, color, sex, age, national origin, ancestry, marital status, sexual orientation, physical or mental disability, or any other characteristic protected by law. WaMu will not tolerate such behavior, even if it is not so severe that it would be considered illegal under federal or state antidiscrimination laws. Harassing conduct is prohibited even if the offender did not intend to offend or believed his or her conduct was welcome. WaMu expects its Vendors to share its commitment to equal opportunity in the workplace and, accordingly, not to engage in any form of discrimination with respect to its Personnel. Vendor may not threaten its Personnel or others with, or subject them to, harsh or inhumane treatment, including, without limitation, sexual harassment, sexual abuse, corporal punishment, mental coercion, physical coercion, or verbal abuse.

In the event a Vendor or its Personnel become aware of any behavior occurring at a WaMu facility or involving WaMu employees, agents, subcontractors, or suppliers that violates this section, Vendor shall immediately report such behavior to the WaMu employee designated as the recipient of notices under the Vendor's Engagement Contract, unless circumstances prevent such person from receiving notice of the violation, in which event the Vendor shall report the behavior to WaMu's **Employee Relations Department** at **erinformation@wamu.net**, and Vendor shall cooperate with WaMu to undertake an appropriate investigation and, if appropriate, corrective action.

### Drugs or Alcohol in the Workplace

WaMu strives to provide a drug-free work environment. Vendor Personnel may not possess or use illegal drugs at the workplace or come to work under the influence of any substance, including alcohol, that may impair their abilities. Individuals taking prescription medication are responsible for consulting with their pharmacists or physicians in advance regarding any likely effects of the medication on their job performance and for discussing any such effects with their supervisors.

Other than at appropriate WaMu-sponsored events, alcohol is not permitted in any WaMu workplace.

### Employment Practices for Vendors Operating Abroad

WaMu and its Vendors operate in a variety of jurisdictions throughout the world. While WaMu expects and requires its Vendors to comply with all local laws and regulations pertaining to employment practices, jurisdictions with different cultural, political, or legal environments may permit employment practices contrary to the spirit and intent of this *Code*. Accordingly, this section establishes basic employment practices requirements with which all Vendors must comply in order to provide services to or on behalf of WaMu.

5

Forced or Compulsory Labor. WaMu believes it is inhumane to utilize forced, bonded, indentured, prison, or other compulsory labor, and WaMu will not work with Vendors who use such labor. Vendor Personnel should not be required to lodge "deposits" or their identity papers with Vendor and should be free to leave their employment with Vendor after reasonable notice without penalty.

Working Environment. Vendor shall provide a safe, clean, and healthy work environment, including, without limitation, clean restrooms; access to potable water; sanitary food preparation and storage facilities; well-lighted workstations and fire exits; safety equipment; and first aid material; and shall fully comply with all applicable safety and health laws, regulations, and practices. Vendor shall take adequate steps to minimize the causes of hazards inherent in the working environment.

Child Labor. WaMu does not and will not tolerate the use of child labor. Vendor shall comply with all local minimum working age laws and requirements and not utilize child labor, and no Vendor Personnel shall be under the legal minimum working age of the respective region where such labor is performed. Under no circumstances may a person under the age of 15 (or 14 where the law of the Vendor's country of operation allows), or younger than the age for completing compulsory education if such age is higher than 15, work in one of Vendor's facilities. WaMu reserve the right to require a higher minimum age for Personnel working on WaMu matters.

Wages and Benefits. Vendors must offer their Personnel fair compensation through wages and other benefits, in accordance with minimum wage requirements or prevailing local industry practice, whichever is higher.

Working Hours. Vendors must comply with all applicable hour laws and regulations, including those related to overtime.

Disciplinary Practices. WaMu will not tolerate its Vendors using corporal punishment or other physical or mental coercion.

## CONFIDENTIALITY AND USE OF COMPANY INFORMATION

### Confidentiality

In general, it is the responsibility of all Vendors and their Personnel to maintain the confidentiality of all Confidential Information (as defined in Vendor's Engagement Contract) in accordance with the specific terms and conditions set forth in Vendor's Engagement Contract (into which this *Code* may be incorporated).

Whenever a Vendor or its Personnel is/are in doubt as to the confidentiality or proprietary nature of information, they should consult with the applicable Senior Manager in the business unit that has engaged the Vendor prior to taking any action with such information. In the event Confidential Information is handled in an unsecured manner or shared, intentionally or unintentionally, with an unauthorized party, the Vendor shall, within twenty-four (24) hours of such incident, notify WaMu at CorpInformationSecurity@wamu.net and call the WaMu Security Operations Center at 888-497-3287.

### Customer Privacy

Vendors and their Personnel may not access customer information, including information about a customer who is also an employee, except, and only to the extent, as expressly authorized in the Vendor's Engagement Contract. Vendors and their Personnel must maintain confidentiality when sharing customers' personal financial information within WaMu or the Vendor organization, must use such information solely for the purposes set forth in the Vendor's

6

Engagement Contract, and may not share such information with other third parties except, and only to the extent, as expressly authorized in the Vendor's Engagement Contract.

To protect the privacy of WaMu's external and internal customers, Vendors and their Personnel who may have access to customer information should read and understand WaMu's *Privacy Policy* (posted online at www.wamu.com, or available on request for Vendors who do not have access to the online version). The Privacy Policy explains WaMu's practices for safeguarding, collecting, and sharing customers' non-public personal information and the circumstances under which WaMu may use this information.

### Insider Information

In the course of an engagement by or on behalf of WaMu, a Vendor and its Personnel may learn material non-public information about WaMu, its employees, its customers, or the companies with which it does business. For purposes of this *Code*, "material non-public information" means information that is not generally known or has not been made available to the public through appropriate means, such as a press release, where there is a substantial likelihood that a reasonable investor would consider such information important in deciding whether to buy, hold, or sell a security, including information that could reasonably be expected to affect the price of WaMu's stock. Such material non-public information may not be disclosed to anyone until it has been disclosed to the public nor may it be used for personal gain or disclosed to others to make investments based on the information. Vendors and their Personnel should be very careful when investing in or discussing WaMu, its customers, or the companies with which it does business so that their activities will not be perceived as insider trading or facilitating the insider trading activities of others.

## POLITICAL AND CIVIC ACTIVITIES AND CONTRIBUTIONS

### Activities and Contributions Generally

WaMu encourages Vendors and their Personnel to exercise their responsibility to vote and take an active interest in the issues of their communities. However, they may not display political symbols, distribute political literature, gather signatures on a petition, or otherwise engage in political activity at WaMu facilities or functions. They may not use envelopes or stationery printed with WaMu's name or address for political correspondence.

Vendors and their Personnel are free to make contributions to any political candidate or party, but (a) they may not make donations or present gifts in the name of WaMu; and (b) they must ensure that any recipient of a contribution understands that the contribution does not represent an endorsement from WaMu and is not intended to obtain any reciprocal benefit for WaMu.

### Lobbying Activities

Vendors and their Personnel may not undertake activities on behalf of WaMu that are designed to influence the decisions or actions of government officials in a manner that would require them or WaMu to register as a lobbyist, or employer of a lobbyist, without the prior written authorization of WaMu's Government and Industry Relations Department. Whenever there exists even the slightest doubt about whether certain conduct could require registration or reporting as a lobbyist, **WaMu's Government and Industry Relations Department, 206-500-4945**, should be contacted for guidance prior to engaging in the activity.

## COMPLIANCE WITH LAWS, RULES, AND REGULATIONS

As a financial services company, WaMu operates in a highly regulated business environment. Accordingly, Vendors and their Personnel are expected to understand, respect, and conduct all business activities in full compliance with all laws, regulations, policies, and procedures

7

applicable to the Vendor's business activities with and/or on behalf of WaMu. If in doubt, a Vendor and/or its Personnel should consult the Vendor's legal counsel to determine and understand the applicability of the laws, regulations, and WaMu policies and procedures in a given situation. In addition to any specific obligations in Vendor's Engagement Contract, Vendor and its Personnel shall, without limitation:

(1) Comply with all applicable trade control laws as well as all export, re-export, and import requirements;

(2) Conduct business in full compliance with antitrust and fair competition laws;

(3) Comply with all applicable environmental laws and regulations;

(4) Be honest, direct, and truthful in discussions with regulatory agency representatives and government officials;

(5) Not participate in international boycotts that are not sanctioned by the U.S. government or applicable laws; and

(6) Comply with applicable anticorruption laws, including, without limitation, the United States Foreign Corrupt Practices Act, and not authorize or make any direct or indirect payments or promises of payments to foreign government officials for the purpose of inducing the individual to misuse his/her position to obtain or retain business.

## COMPLIANCE WITH THIS CODE

All Vendors are responsible to educate and ensure that their Personnel understand this *Code* and to monitor and ensure compliance with the *Code* by such Personnel. Further, a Vendor must promptly inform a WaMu Senior Manager in the business unit that engaged the Vendor if a violation of this *Code* has occurred.

## INTERPRETATION OF CODE AND REPORTING POSSIBLE VIOLATIONS

For additional guidance or answers to questions about how to interpret this *Code*, Vendors should contact a Senior Manager in the business unit that has engaged them.

To report fraud, theft, suspected criminal activities, illegal or dishonest acts, acts that cause, or are substantially likely to cause, harm to people or property, or other possible *Code* violations, Vendors may also contact **WaMu Corporate Security at 888-497-3287** or, to make an anonymous report, call the **WaMu Tip Line at 800-581-1400**.

Acting in a manner contrary to this *Code* may be deemed a breach of the Vendor's Engagement Contract. This could subject a Vendor to termination of its Engagement Contract or could result in removal of individual Vendor Personnel from the WaMu project or workplace, depending on WaMu management's evaluation of the circumstances. Even inadvertent violations of the *Code* may be considered extremely serious.

There will be no retaliation from WaMu or any of its employees against a person who presents in good faith what he or she believes to be evidence of a violation of this *Code* or of an illegal, harmful, or dishonest act committed by someone working for or on behalf of WaMu.

## CONCLUSION

WaMu thanks all of its Vendors and Vendor Personnel for their continuing commitment to upholding WaMu's principles and ethical standards. WaMu may amend or otherwise modify this *Code* at any time.

8

**Schedule C**
**Working with WaMu**

## *Working with WaMu*
### *(for contract staff working onsite)*

### *About This Document*

Welcome to Washington Mutual. At Washington Mutual, we have a responsibility to our shareholders and customers to protect our valuable assets from loss or misuse. We also believe that it is important to communicate our expectations to staff hired through agencies or other vendors and directly as contractors. This document informs you about your responsibilities regarding confidentiality, security, use of company property, and other matters.

Signing this form is a prerequisite to working at any of our workplaces and being given access to our computer resources. By signing it, you acknowledge that you have read, understand, and agree to abide by the policies and terms contained or referred to in this form.

### *Confidential Nature of Work*

In connection with your performance of services for Washington Mutual ("Company" or "WaMu"), you may be entrusted with and have access to equipment, systems, and information related to our business and our customers, all of which are highly valuable assets of the Company. Examples of items that must be treated as confidential include, but are not limited to: business systems; access to systems; information about customers, vendors, and employment relationships; products; research and development material; customer accounts, including employee accounts; policies and procedures; and corporate decisions and future plans.

We consider all information about our business or customers that is not generally known to the public or to our competitors to be confidential and protected as trade secrets under applicable law (collectively "Confidential Information"). This Confidential Information is a valuable asset of the Company, and protection of this asset is important to maintaining our competitive position in the financial services industry. It is the responsibility of all individuals who have access to Confidential Information to maintain its confidentiality and integrity both during and after his or her service with Washington Mutual. If you believe Confidential Information has not been properly protected or you are unsure of the confidential or proprietary nature of resources, consult WaMu management or call the Corporate Technology Solutions Center (Information Security option) at (877) WAMU-123 before taking any action.

### *Washington Mutual Security Statement*

It is critical that Washington Mutual protect its Confidential Information and its other assets and resources from loss, damage, or disruption due to unauthorized or inadvertent access, disclosure, or modification. Your responsibilities for protecting Company information are detailed in our Information Security Policies and Standards that are relevant to the work you are performing for WaMu and/or to the WaMu resources to which you have access. The Information Security Policies and Standards are available from WaMu upon request or through your employer. If you become an authorized user of the Company intranet, they are also available through the Company Policies page at http://colleb.wamu.net/sites/005/Legal/Contracts/Exhibits/Working%20with%20WaMu%20for%20Contract%20Staff%20(2004).pdf.

Some of your specific responsibilities under the Information Security Policies and Standards are summarized and confirmed below.

CONFIDENTIAL INFORMATION: I agree to maintain the confidentiality of all Confidential Information in accordance with the agreement under which I am performing services for WaMu. I will not directly or indirectly disclose any Confidential Information to anyone outside of the Company or to anyone inside the Company who does not have the need to know such information for business purposes. I understand and agree that this obligation to protect Confidential Information applies during the term of my assignment to provide services for the Company and continues after the termination of my assignment.

I will not alter or in any way change Confidential Information except in the performance of the duties of my job. I will not attempt to gain access to such information or data storage facilities unless I am specifically authorized to do so. I will not disable, bypass, or disregard security features or controls unless I am specifically authorized in writing by WaMu's Chief Information Security Officer to do so.

## *Working with WaMu*
### *(for contract staff working onsite)*

I will comply with WaMu Information Security Policies and Standards.

USER IDs AND PASSWORDS: I understand that I am responsible for the security of my password(s) and that any User IDs or passwords assigned to me are to be used only by me and are not to be disclosed to anyone, either directly or indirectly. I understand that I am responsible for all activities or transactions performed with my User ID(s) and password(s) on any workstation. I will not use a User ID or password assigned to another person.

I will comply with all WaMu procedures in the assignment and format of my passwords.

I will report any knowledge or suspicion of unauthorized attempts to breach security or knowledge of security loopholes to the WaMu Corporate Information Security Department at (206) 377- 1960 or the WaMu Tip Line at (800) 581-1400, or as otherwise directed in the agreement under which I am performing services for WaMu.

COMPUTING RESOURCES: Computing resources (including but not limited to e-mail, instant messenger, and Internet and intranet access, as well as other software and hardware) may be provided to you for business use. While reasonable personal use of such resources is permissible (unless prohibited by an applicable license), any information stored on them is assumed to be the property of WaMu, and I have no expectation of privacy in any such information.

I understand that WaMu owns and has the right to access all electronic files maintained on Company equipment, including my electronic mail, computer files, and cache. The purpose for access could include quality assurance, maintenance, auditing, security and other investigations, debugging, and for other purposes the Company deems appropriate.

While it is not Company policy to routinely read e-mail and listen to voicemail on WaMu systems, I understand that the Company has the right to access my e-mail and voicemail and monitor my Internet activities as it deems appropriate.

I will read and comply with the terms and conditions of applicable software licenses. I will not use personally-owned software on WaMu-owned computers, and I will not make or possess any unauthorized copies of copyrighted software on either WaMu premises or equipment.

I am aware that on my last day of service, or at Company discretion my access authorizations terminate; and I am to return WaMu Company access cards, badges, and all WaMu computer resources assigned to me.

### *Washington Mutual's Property*_____

| WORK AREAS: All WaMu computers, related equipment, software, access capabilities, storage facilities and contents are the sole property of Washington Mutual, as are all fixtures, furniture, equipment, supplies, and materials ("Company Property"). Company Property is provided for you to use while providing services to Washington Mutual. It is not intended for personal use. You may not enter any WaMu facility, room, or area for which you are not authorized unless escorted by a WaMu employee. You may not abuse your authority to gain access to any facility, room or area for which authorization has not been given. It is your responsibility to preserve and protect Company Property. You may not use Company Property for personal gain or other unauthorized purposes. Your responsibility to preserve and protect this property includes, but is not limited to, preventing unauthorized modification, damage, destruction, disclosure, use, or loss by you. | WaMu's RIGHT TO SEARCH / MONITOR: To protect Company Property, Confidential Information, our customers' assets (including their confidential information), the safety and security of staff and customers, and to ensure quality service, it may be necessary for the Company to:<br><br>☐ Monitor work areas.<br>☐ Conduct searches or inspections of work areas or property, including desks, lockers, papers, computers or personal property brought onto Company property, such as purses, briefcases, clothing, etc.<br><br>While it is not Company policy to routinely search staff, contractors, or their work areas, by accepting an assignment with Washington Mutual, you consent to such monitoring or searches and agree to cooperate with any investigation. |
|---|---|

## *Working with WaMu*
### *(for contract staff working onsite)*

### *Using Personal Vehicles on Company Business*_____

If you use your personal vehicle while on Company business during assignment with WaMu, you are responsible for having insurance, including bodily injury, property damage coverage, sufficient to at least meet your state's limits for financial responsibility. You are responsible for your physical damage coverage and the deductibles. You are also responsible for carrying a valid driver's license and proof that you are carrying the required insurance. You are responsible for all penalties and fines if you are charged for violations while on Company business during assignment with WaMu.

### *Information about WaMu's Workplace*_____

**CODE OF CONDUCT / ETHICAL STANDARDS:** WaMu expects all personnel, both employees and contract staff, to uphold the highest ethical standards at all times. Our *Vendor Code of Conduct* articulates these standards as they apply to our contract staff. You or your employer has received a copy of the *Code of Conduct* as part of the agreement under which you are performing services for WaMu, and you are responsible for complying with it at all times while performing services for WaMu. The Vendor Code of Conduct is also available on the Company intranet at
http://collab.wamu.net/sites/005/Legal/Contracts/default.aspx.
**APPROPRIATE WORKPLACE CONDUCT:** WaMu expects all personnel, both employees and contract staff, to treat each other with respect and dignity. The WaMu Appropriate Workplace Conduct policy embodies these standards. All employees and contractors are expected to comply with the version of the policy applicable to their state, and to bring any concerns or violations to the attention of management. A copy of the applicable version is available upon request or through your employer. If you become an authorized user of the Company intranet, the policy may also be found through the Company Policies page at *http://next.wamu.net/Company%20Policies/default.aspx.*

□ I have read, understand, and agree to abide by the policies described above, including those regarding Security / Confidential Information and Company Property. I understand that violation of any of these conditions could result in the revocation of my authority to access Confidential Information and Company equipment, and immediate termination of the assignment or contract. I agree that improper use or disclosure of Confidential Information or Company Property would cause irreparable harm to the Company and that money damages would not provide an adequate remedy; therefore, injunctive relief, specific performance, or other appropriate equitable relief may be awarded.

□ I understand that the above conditions supplement, and do not limit or override, any provisions of the Agreement or other contract(s) executed between WaMu and me or the company or firm that employs me. All limitations of liability in the Agreement under which I am providing services to WaMu also apply to WaMu.

□ I understand that I am expected to review and comply with WaMu's *Vendor Code of Conduct.*

□ I understand that I am expected to review and comply with the *Appropriate Workplace Conduct Policy.*

CONTRACTED STAFF MEMBER'S SIGNATURE    PRINTED NAME LAST    FOUR NUMBERS OF SSN DATE

A WaMu Manager must sign below and submit this form to Information Security at mailstop EGH101. By signing this document, you are verifying that the contract staff or contractor named above:

□ Requires OR □ Does NOT Require (check one) the ability to access WaMu's computer systems, including Washington Mutual Confidential Information, and

□ Has been provided a copy of the Vendor Code of Conduct and the Appropriate Workplace Conduct policy.

| AUTHORIZING MANAGER'S SIGNATURE | PRINTED NAME | DATE |
|---|---|---|
| | | |

# EXHIBIT D

Document2



**FDIC**
**Federal Deposit Insurance Corporation**
40 Pacifica, Irvine, CA 92618                                          Division of Resolutions and Receiverships

**CERTIFIED MAIL 7009 0820 0001 6853 9493**
**RETURN RECEIPT REQUESTED**

August 21, 2009


Compliance Coach Inc (#C1201081)
C/O Procopio LLP
530 B Street Ste. 2100
San Diego, CA 92008


SUBJECT:     10015–Washington Mutual Bank
             Henderson, NV – In Receivership
             **NOTICE OF DISALLOWANCE OF CLAIM**

Dear Claimant:

The Receiver of Washington Mutual Bank has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s) :

              Your claim has not been proven to the satisfaction of the Receiver.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (949) 208-6700.

Sincerely,

Claims Agent
Claims Department




RLS7218



**CERTIFIED MAIL**

7009 0820 0001 6853 9493

$ 05.54

MAILED FROM ZIP CODE 92618

**FDIC**
Federal Deposit Insurance Corporation
40 Pacifica, Suite 1000
Irvine, CA 92618-7471

Official Business
Penalty for private use, $300

3MM

Compliance Coach Inc (#C1201081)
C/O Procopio LLP
530 B Street Ste. 2100
San Diego, CA 92008

67